Syllabus.

# Richmond.

## Virginian Railway Co. v. Andrews' Administratrix.

January 13, 1916.

Absent, Cardwell, J.

1. Master and Servant—*Death of Servant—Explosion of Boiler—Boiler Act.*—When a carrier has discharged the duties imposed upon him by what is known as the boiler act, passed by Congress, by turning over to an engineer a locomotive engine and boiler and appurtenances in proper condition and safe to operate, he is not answerable to the engineer as an insurer of his safety throughout the run, and, in order for his personal representative to maintain an action for his death caused by the explosion of the boiler, the burden rests upon the plaintiff to show that the defendant has been guilty of the negligence charged in the declaration.

2. Witnesses—*Experts—Qualifications—Opinions of Nonexperts.*—The opinion of a witness, who is shown to possess no adequate knowledge of the subject, as to the cause of the explosion of a locomotive boiler is not receivable in evidence. He is not an expert, and such opinions are altogether speculative and inadmissible in evidence.

3. Witnesses — *Opinions — Evidence.* — Opinions of witnesses founded neither upon facts within their knowledge nor established by other evidence in the case are matters of speculation and possess no evidential value. The admission of such opinions in evidence violates the fundamental principle that an inference cannot be drawn from a presumption, and a verdict resting upon such a foundation is not the fruit of evidence, but of conjecture, and cannot be upheld.

4. Witnesses—*Experts—How Examined.*—Before the opinion of an expert, based on facts to which he has not himself testified, can be admitted, he must fully understand the facts already proved, and his testimony must come in response to a hypothetical question embodying the evidence.

5. Negligence—*Happening of Accident—Burden of Proof—Case at Bar.*—The mere happening of the accident, under the circumstances of the case at bar, does not *per se* cast upon the defendant the imputation of negligence, but to warrant a recovery the burden is upon the plaintiff to prove that the defendant has been guilty of the negligence alleged in the declaration.

6. Master and Servant—*Death of Servant—His Negligence Sole Cause—Comparative Negligence—Federal Employers' Liability Act.*—The question of comparative negligence provided for in the Federal Employers' Liability Act has no application to a case where the negligence of the plaintiff's intestate was the sole cause, not the contributory cause, of his death.

Error to a judgment of the Circuit Court of Montgomery county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Ellett & Phlegar, Hall, Woods & Coxe* and *G. A. Wingfield,* for the plaintiff in error.

*A. P. Staples, Jr., A. B. Hunt* and *W. L. Welborn,* for the defendant in error.

Whittle, J., delivered the opinion of the court.

The right of the defendant in error, who was the plaintiff below, to recover damages for the death of her intestate was rested upon the grounds stated in a declaration containing four counts. The court sustained a demurrer to the fourth count, and, without objection, instructed the jury that there was no evidence to sustain the second count; so that the case was tried on the first and third counts.

(1) The first count alleges that the stay-bolts supporting the crown-sheet were made of defective material, that the workmanship was faulty; and that they had been weakened and rendered unsafe by previously having been burned. (2) And the third count alleges that the glass water-gauge was out of repair and in an unsafe condition; the valves therein being stopped up with lime, trash or other deposits, and improperly registered the quantity of water in the boiler. Both these counts are founded on an act of Congress approved February 17,

1911, entitled, "An act to promote the safety of employees and travelers by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto."

The following is an outline narrative of the salient facts: The engine which is the subject of investigation was one of ten engines built for the defendant by the Baldwin Locomotive Works, which is one of the largest and most reliable manufactories of engines in the United States. At the time of the accident the engine was practically new, having been used for the first time in May, 1912. It was constructed with great care, both with respect to material and workmanship; and, during the course of construction, in every detail, was subjected to rigid inspection by experienced inspectors detailed by the defendant for that service. The specification called for a crown-sheet for the engine with a margin of safety of 13.3 under steam pressure of 200 pounds. The engine was being operated with a steam pressure of 185 pounds, and, properly handled was capable of withstanding a pressure of about sixteen times the pressure to which it was subjected at the time of the accident. The inspectors tested the tensil strength of the materials used in the crown-sheet and stay-bolts before they were put in the engine, and found them of the required strength. After the engine had been completed, the boiler was thoroughly tested with water and steam, and likewise proved satisfactory. It was then washed out with soda and cleansed of grease, oil and other foreign substances used in and which collected during the course of construction. The engine was practically in the control of plaintiff's intestate and run by him during the entire time it was in operation. On November 11, 1912, three days prior to the accident, it was inspected by government inspectors under the act of Congress, which inspection showed that the engine, boiler and appurtenances were in perfect condition. From the time of that inspection until the explosion, the engine was exclusively operated by

Engineer Andrews.  In the interval he had made two trips from Princeton, West Virginia, to Roanoke, Virginia, and return, and had run the engine back to Roanoke.  On November 14, 1912, at 9:30 p. m., he left the latter city for Princeton, pulling three loaded cars and seventy-nine empties, and had proceeded about eighteen miles on his journey when the explosion happened.  In addition to the inspections provided for by the boiler act, the defendant enjoined upon the engineer the duty to inspect his own engine, and at the end of each run to make a written report of its condition.  Accordingly, in obedience to that rule, when the engineer arrived at Roanoke on the morning of November 14th, he made his report that he had carefully inspected the engine and its appurtenances and found it in good condition, with the exception of certain unimportant defects to which attention was called, and which were speedily repaired.  There was no suggestion in the report of any defect in the crown-sheet.  Moreover, on the night of the accident, the hostler examined the crown-sheet before turning over the engine to the engineer, and discovered no. defects in it; and after the engineer took charge of the engine, shortly before setting out from Roanoke, he again examined the crown-sheet.

It thus appears from the undisputed evidence that at 9:30 p. m., the time of departure for Princeton, just one hour before the explosion, the defendant had complied with every requirement of the boiler act, and the locomotive engine, boiler and appurtenances measured up to statutory standard.

After the explosion the engine was hauled to Princeton by another engine.  The cab was boxed up as required by the boiler act, and the engine, boiler and appurtenances remained in the condition in which they were found after the explosion until November 16th and 17th, when they were inspected by two government inspectors sent out for that purpose by the Interstate Commerce Commission.  These officials made their report and also testified at the trial, and proved that apart from

the injury caused by the explosion the boiler and all its appurtenances, including the injectors which carried water from the tank to the boiler, and the glass water-gauge were in perfect condition. Those inspectors were furthermore of opinion that the explosion was unquestionably due to low water in the boiler. This opinion was concurred in by a number of other witnesses of wide experience in the observation of crown-sheets blown down from low water in the boiler. Indeed, the concensus of opinion witnesses on both sides was that the crown-sheet had been burned—that is to say, it had been heated with no water on top of it—though the expert witnesses for the plaintiff testified that the color of the crown-sheet indicated that it had been burned prior to the time of failure, and had water on it when it actually failed. They were also of opinion that the presence of oil, or perchance some other foreign matter in the boiler, made it possible to burn the crown-sheet though covered with water. But these theories were refuted by the positive evidence that the crown-sheet had not previously been burned, and that there was no oil or other foreign substance in the boiler at the time of the failure. As remarked, the engine left Roanoke an hour before the accident in good condition, and there was no evidence of leakage during the short run of eighteen miles, which would necessarily have been the case had the theory of the experts that the crown-sheet had been previously burned been correct.

It is insisted on behalf of the plaintiff that in legal intendment the boiler act is not to be distinguished from the original safety appliance act of March, 1893, and amendments, and the employers' liability act of 1908. These latter acts have been construed by the Supreme Court of the United States to impose upon the carrier the absolute duty to provide and maintain proper couplers and other appliances therein mentioned at all times and under all circumstances. *St. L., F. M. & S. Ry. Co.* v. *Taylor,* 210 U. S. 281, 28 Supt. Ct. 616, 52

L. Ed. 1061; *C., B. & Q. R. Co.* v. *U. S.*, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582; *Delk* v. *St. L. & S. F. R. Co.*, 220 U. S. 580, 31 Sup. Ct. 612, 55 L. Ed. 590, and *Grand Trunk Ry. Co.* v. *Lindsay*, 233 U. S. 42, 34 Sup. Ct. 581, 58 L. Ed. 838, Ann. Cas. 1914C, 168.

It will be observed that the safety appliances considered in the foregoing and analogous cases, either work automatically, as couplers which operate by impact, or else are simple contrivances, as draw-bars and the like, which are the objects rather than the subjects of action, and when once placed in position remain intact and discharge their functions until changed by some active agency. A locomotive engine, on the other hand, however perfect its condition may be, in its operation calls for the continuous exercise of a high degree of skill and experience, and the constant supervision and attention of the engineer. In other words, the two classes of instrumentalities are so inherently diverse in character and use that rules which would be reasonable and appropriate in respect to the one class would be impossible of practical application to the other. The avowed object of the boiler act, it is true, is to promote the safety of employees and travelers, and to that end section 2 declares that from and after July 1, 1911, it shall be unlawful for any common carreir to use any locomotive engine propelled by steam power in moving interstate or foreign traffic unless the boiler and appurtenances thereof are in proper condition and safe to operate in the service to which the same is put, that the same may be employed in the active service of such carrier in moving traffic without unnecessary peril to life and limb. When, therefore, the carrier has discharged his statutory duty to the engineer by turning over to him a locomotive engine and boiler and appurtenances in proper condition and safe to operate, it is not answerable to the engineer as an insurer of his safety throughout the run; and in order for his personal representative to maintain an action for his death caused by

the explosion of the boiler, the burden rests upon the plaintiff to show that the defendant has been guilty of the negligence charged in the declaration.

The occupants of the cab at the time of the accident were the engineer, Andrews, a brakeman, Lucas, and the fireman, Jerre Walton. The two former were killed, and the plaintiff sought to prove by Walton that the explosion resulted from defects in the crown-sheet or stay-bolts which existed prior to the accident. This witness admittedly had no familiarity with that type of engine, that being his first trip on an engine of that class; and, not to mention distractions incident to the discharge of his ʼduties as fireman his only opportunity for acquiring information concerning the engine, boiler and appurtenances covered an hour in time and eighteen miles in distance. He never saw the crown-sheet until after the explosion, and did not know the height of the firebox door, or what position he would have to assume to see the crown-sheet, or whether there was a brick arch inside the engine which would obstruct the view of the crown-sheet. Nevertheless, he was permitted to express the opinion that if the crown-sheet had been burnt on that trip and made red hot there would have been a different glow in the fire-box. The opinion evidence of this witness was altogether speculative and plainly inadmissible. *Virginia-Carolina Chem. Co.* v. *Knight,* 106 Va. 674-677, 56 S. E. 725; *Norfolk & Portsmouth Traction Co.* v. *Ellington,* 108 Va. 245, 61 S. E. 779, 17 L. R. A. (N. S.) 117.

The same is true of the evidence of the witness, Richardson, on the same point. Walton also testified that the injector was working properly and supplying water to the boiler, basing his opinion on the sound it gave forth; yet he admitted that he was without experience as to injectors of that sort. He testified that the injectors and pipes leading from them into the boiler were located inside the cab, when in fact they were on the outside. Other witnesses for plaintiff testified that it required familiarity with this class of engine and ejectors for

one to determine from the sound whether they were working properly or not, and that could not be done when the cab window was closed. Walton moreover testified that the water glass showed water in the boiler when the train left Roanoke, and from then to the Norfolk and Western overhead bridge, and also at Singers' tank, where he noticed it for the last time. The distance from Singers tank to the point of accident is two and one-half miles, and a train moving at eighteen miles an hour would cover that distance in eight minutes and twenty seconds.

It was also in evidence that though the injector was in good order, it would not automatically supply the engine with water, but to accomplish that result it was necessary for the engineer to properly adjust the valves introducing water and steam into the injector, and unless that was done the water would not be forced into the boiler but would escape through the waste pipe; and, furthermore, if that precaution was neglected, that the interval of time which elapsed between Singers' tank and the point of accident was sufficient for the crown-sheet to become exposed from lack of water, in which event the explosion would have been inevitable.

We shall not extend this opinion by entering upon a detailed analysis of the evidence of expert witnesses for the plaintiff. The trial court allowed great latitude in their examination, and numerous theories were advanced as to what possibly might have caused the accident. However, it is enough to say that a painstaking examination of this evidence shows that the opinion of the witnesses were neither founded upon facts within their own knowledge, or established by other evidence in the case. Hence, their conclusions were matters of speculation, and possessed no evidential value. Such statements violate the fundamental principle (so often accentuated in opinions of this court) that an inference cannot be drawn from a presumption. A verdict resting upon such foundation is not the fruit of evidence, but of conjecture, and cannot be upheld.

"Before the opinion of an expert, based on fact to which he has not himself testified, can be admitted, he must fully understand the facts already proved, and his testimony must come in response to a hypothetical question embodying the evidence." *City of Richmond* v. *Wood,* 109 Va. 75, 63 S. E. 449.

These essential rules of evidence were not observed in the trial of this case, and there is no criterion by which to estimate the influence that this inadmissible matter may have exerted on the minds of the jury.

We are of opinion that the body of the evidence, viewed from the standpoint of a demurrer to the evidence, shows that on the night of November 14, 1912, when the engine was turned over to plaintiff's intestate, the boiler and appurtenances were in proper condition and safe to operate in the service to which the same were to be put in moving traffic without unnecessary peril to life and limb, within the true intent and meaning of the act of Congress. When the explosion occurred, the locomotive engine and boiler and appurtenances were in the exclusive custody and control of the engineer and were being operated by him. In these circumstances, upon settled principles, the mere happening of the accident did not *per se* cast upon the defendant the imputation of negligence; but to warrant a recovery the burden rested upon the plaintiff to prove that the defendant had been guilty of the negligence alleged in the declaration.

Nor is this a case, as was pressed in argument, where the negligence of the engineer should go to mitigate the damages, but not to bar the right of action. The evidence tends to show that the negligence of plaintiff's intestate was the sole cause, not the contributing cause, of his death, and, therefore the rule invoked under the employers' liability act has no application.

We are further of opinion that the plaintiff has not successfully borne the burden of proof thus resting upon him, and that the evidence was not sufficient to warrant the verdict.

For these reasons the circuit court erred in overruling the motion of the defendant to set aside the verdict on the ground that it was contrary to the law and the evidence.

This view of the case is controlling and renders it unnecessary to discuss the subordinate assignments of error.

The judgment complained of must be reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed.*