CORA BELLE LUCE, as Administratrix, etc., of WALTER M. LUCE, Deceased, Respondent, *v.* NEW YORK, CHICAGO AND ST. LOUIS RAILROAD COMPANY, Appellant.

Third Department, June 27, 1924.

**Railroads — action under Federal Locomotive Boiler Inspection Act to recover for death of plaintiff's intestate, engineer on switching engine — intestate left engine standing on down grade with brakes off while he attempted to stop squeaking in air pump — burden of proof is on plaintiff to show that engine was not in proper condition and safe to operate in service to which it was put — squeaking of air pump due to lack of lubrication, very small leak in air pipe and crossing of oil lines not proof that engine was not in proper condition and safe to operate as switching engine — question of condition of engine was one of law, since there was no proof of defect.**

In an action under the Federal Locomotive Boiler Inspection Act to recover for the death of a railroad engineer who was killed while he was endeavoring to stop the air pump from squeaking while the engine was standing on a down grade with the brakes off, the burden of proof is on the plaintiff under said act to show that the locomotive was not in proper condition and safe to operate in the service to which the same was being put, and that it could not be employed in moving traffic without necessary peril to life and limb.

Proof that the air pump squeaked, a condition common on all locomotives, which is due to lack of lubrication and that there was a very small leak in the oil pipe that did not affect its use in conveying oil and that two oil lines were crossed which did not in any way interfere with the proper lubrication of the parts to which they were connected, does not show that the locomotive was not in a proper and safe condition for use as a switching engine and such condition did not constitute a defect in the locomotive.

Since there was no proof bringing the case within the Federal Locomotive Boiler Inspection Act, the plaintiff did not have the right to go to the jury on the question of the condition of the engine at the time of the accident.

APPEAL by the defendant, New York, Chicago and St. Louis Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Erie on the 26th day of October, 1923, upon the verdict of a jury for $7,500, and also from an order entered in said clerk's office on the 27th day of December, 1923, denying the defendant's motion for a new trial made upon the minutes.

This appeal was transferred to the Third Department from the Fourth Department of the Appellate Division (209 App. Div. 846).

*Locke, Babcock, Spratt & Hollister* [*Evan Hollister* of counsel], for the appellant.

*Hamilton Ward,* for the respondent.

McCANN, J.:

Plaintiff's intestate was employed by defendant as a locomotive engineer on yard engine No. 202. He went on duty at ten-thirty P. M., April 23, 1923. The accident which is the subject of this action occurred between five-thirty and six A. M. on the morning of April 24, 1923. The engine had just delivered a string of cars to what was known as Howard's Yard in the city of Buffalo. Thereafter it returned and backed in on track No. 5 of the switch yard and coupled on to seven cars standing on such track. This track was laid on a grade of about six inches to every 100 feet and the seven cars were held by hand brakes. As soon as the coupling was made, the engineer told his fireman, Culligan, that he was going to oil the air pump which had been " squeaking " or " squealing " during the night. He set the independent brake or straight air, so called, which controls the brakes on the engine and tender, placed the reverse lever in a neutral position, shut off the steam from the steam end of the air pump by closing the air pump throttle which latter operation stopped the air pump and took the air from the reverse lever, which air was used to aid the engineer in operating the reverse lever. After leaving his engine in the condition described, he stepped to the ground on the left side of the cab. The engine at this time was without brakes except that it was held in place by hand brakes that were on the car to which the engine and tender were attached. He gave no warning to the brakeman in charge of the seven cars that he was leaving the engine without the brakes set. When deceased reached the ground, he opened the cock which was attached to the steam end of the pump, thus allowing the oil and steam in the pump to escape. The fireman

at the request of the engineer stepped off the engine to render assistance. The deceased then opened the drain cocks to both main air reservoirs, one of which was located on each side of the engine. This resulted in draining all of the air from the air pump before oiling the same. This last operation had the effect of rendering all of the brakes useless by removing all air control therefrom. While the engineer was draining the air the brakeman on the cars attached to the engine and tender released the hand brakes and the engine, tender and seven cars immediately moved forward by gravity. Deceased climbed into the cab from the left; he attempted to pull the reverse lever by hand but being without the aid of the air he was unable to do so. The engine and cars were meanwhile drifting slowly forward. Deceased again stepped to the ground on the left side of the engine, ran alongside and while the engine was moving shut off the drain cock to the left air reservoir, at the same time directing the fireman to do likewise to the air cock on the main air reservoir on the right side of the engine. At this time the engineer and fireman were both on the ground at the left side of the engine. The latter ran around ahead of the engine to the right side and closed the drain cock to the right air reservoir as the engineer had directed him. While so doing he heard the deceased cry out, and looking in the direction from which the noise came saw deceased beneath the engine. There was no eye witness to the accident but it seems to be assumed by all that the deceased must have attempted to run across and in front of his moving engine and was either struck or accidentally fell while attempting so to do and was run over and killed. The fireman immediately climbed into the cab and attempted to stop the moving engine and cars by the use of air or steam pressure but was unable to do so until the cars had moved about twenty-five car lengths, when they finally stopped as the result of the pump beginning to operate after the closing of the cocks. The engine was taken to the roundhouse and remained in the same condition as at the time of the accident until the day following when it was given a thorough examination by a Federal inspector who after such examination released the engine to go back into service. This action is brought by the administratrix of the estate of the deceased engineer and is based upon the Federal Locomotive Boiler Inspection Act of 1911, so called, which in so far as it is applicable to the case at bar provides:

" From and after the first day of July, nineteen hundred and eleven, it shall be unlawful for any common carrier, its officers or agents, subject to this Act to use any *locomotive engine* propelled by steam power in moving interstate or foreign traffic unless the

boiler of said locomotive and appurtenances thereof *are in proper condition and safe to operate in the service to which the same is put,* that the same may be employed in the active service of such carrier in moving traffic without unnecessary peril to life or limb, *and all boilers shall be inspected* from time to time in accordance with the provisions of this Act, and be able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for."   (36 U. S. Stat. at Large, 913, chap. 103.)

The act was amended in 1915 so as to provide that section 2, above quoted, " shall apply to and include the entire locomotive and tender and all parts and appurtenances thereof."   (38 U. S. Stat. at Large, 1192, chap. 169.)

The complaint alleges a cause of action under the Federal Boiler Inspection Act above set forth and pleads a failure to properly inspect, maintain and repair the boiler, engine, air pumps, lubricators, etc., and in permitting such air pumps, lubricators, etc., to become worn, broken, defective and improper for the use to which they were put.   The burden of proof rested upon the plaintiff to prove under the language of said act that the appurtenances of the locomotive were not in *proper condition* and that they were not *safe to operate in the service to which they were put* and *to show the failure of the defendant to keep them in such safe and proper condition so as not to cause unnecessary peril to life or limb.* The only evidence offered as bearing upon the defective or improper condition was with reference to the air pump and oil lines connected therewith on the left-hand side of the locomotive.   It is claimed that the air pump " squeaked " or " groaned " while in operation during the time deceased was in charge of the engine from ten-thirty P. M. the night before until five-thirty or six A. M. on the day of the accident.   This " squeaking " or " groaning " was described by the fireman and two engineers who had used the engine before the deceased took charge of it and it was proved to be a common occurrence and that the same was due to lack of lubrication.   There was no proof of any defect in the pump nor was there any evidence that the " squeaking " or " groaning " could not have been relieved by proper lubrication, either by the automatic arrangement provided for the feeding of the oil to the pump or by the operation of an auxiliary feed pipe constantly in view of the engineer and subject to his management and control. Lubrication was necessary at both ends of the pump, the steam and air ends respectively.   Leading to and acting as an auxiliary feed for the air end of the pump was a small pipe which was afterwards found to have a small hole not larger than a pin head. This hole was in the upper or top part of the pipe and permitted

a very slight amount of oil to leak out. The oil in this pipe was not under pressure but ran to the pump by gravity and was operated as above stated by a valve from the engine cab. The air end of the pump required no more than a teaspoonful of oil every eight hours and this amount was ordinarily supplied by the engineer at one time, so that if there had been any leakage of oil, the engineer could have supplied an equal amount to replace any amount which was lost. The second claim of defect in the engine was that two oil lines which fed the cylinder on the left of the engine and the cylinder which operated the air pump were reversed so that the pipe which was intended to be connected with the air pump was connected with the left steam cylinder. It appeared that these pipes had been in that condition for two years at the time of the accident and for two months thereafter. Much is claimed by the plaintiff as to the effect of the crossing of these pipes, but there is no reason for believing or even surmising that such could have caused the " squeaking " or " groaning " in question, or in fact had any effect upon the operation of the mechanism. It has been proved by numerous witnesses that the amount of oil supplied by each of these pipes was practically the same and that the crossing thereof could not under any circumstances have caused any danger or created any defect because it was the duty of the engineer to use all three of these valves in the ordinary lubrication of the cylinders and pumps and that in so doing a sufficient amount of oil would have been supplied at all times for the lubrication of the pump.

The plaintiff was compelled to prove her case by the testimony of employees of the defendant and claims that she was dealing with reluctant and hostile witnesses. Be that as it may, plaintiff produced all of the facts which could have been established in the case and the record does not show that she suffered in any way thereby. The statute required the locomotive and appurtenances to be in a *proper and safe condition*. It did not require a *perfect* condition, but a condition proper and safe for the purpose of operating in the service to which the same was put. This particular service was that of a yard engine. There might possibly have been a different degree of perfection required in the condition had the engine been drawing a fast passenger train at sixty miles or more per hour. No evidence has been produced to show any improper condition which would render the use of such engine unnecessarily perilous to life or limb. The conditions which existed were known and had been known for some weeks. It was not a condition which could be called a defect. It was simply a condition which required more attention on the part of the engineer in supplying proper lubrication. The " squealing " or " squeaking " or " groaning," as

it has been termed, meant nothing but a dry condition, which needed oil. The fact that the engine had become dry does not show that it was defective or that its continued use would be dangerous. The air brakes worked properly; proper steam pressure was maintained. One witness swore that if used for a considerable length of time it would become coated but it was not used for a considerable length of time without lubrication. The evidence of all the witnesses sworn on the subject, without any exception, shows that the " squeaking " or " squealing," so callèd, was a matter of common occurrence in the operation of engines. There is not a suggestion that any sudden exigency might arise which would cause any overheating, which would render continued use unsafe. The defect created by the pin hole in the top of one of the pipes did not create a dangerous condition because it has been shown that the pipe was fed by gravity, that the hole was on the top of the pipe, that there was no pressure on the oil which flowed through the pipe and that very little oil escaped through the pin hole. The only other defect claimed is the crossing of the feed pipes hereinbefore referred to. In any event the supply of oil necessary could easily have been regulated by the engineer from his seat in his cab. It is urged that the question of the condition of the engine is one of fact for the jury. In this case it is a question of law. It is a failure of proof. The plaintiff has not proved any improper conditions nor any facts to show that the engine was not safe to operate in the service to which the same was put. The words " proper condition " and " safe to operate " must be read in connection with the words " the service to which the same is put." The engine might be in proper condition for one purpose and not be safe to operate for another purpose, but the question to be solved under the statute above quoted is whether or not it meets the two requirements of being in *proper condition* and *being safe to operate in the service to which the same is put* and not in some other service.

Few authorities have been cited and none need be to solve the problem presented in this case. It has resolved itself into a question of sufficiency of proof. The Federal Locomotive Boiler Inspection Act requires a certain condition to exist. It is for the plaintiff to prove that it did not exist. The case of *Ford v. McAdoo* (231 N. Y. 155) held that in determining the question of proper conditions and safety under the Federal Locomotive Boiler Inspection Act " that mechanism which has been in constant use for years without causing injury must be considered proper and safe until some notice or occasion indicates its danger and insufficiency." What notice or occasion in this case indicated any

danger or insufficiency for the purposes for which this engine was being used?

The case of *Virginian Railway Co.* v. *Andrews* (118 Va. 482), while not perfectly analogous to the one at bar, recognizes the fact that an engine cannot be in absolutely perfect condition at all times and states: " It will be observed that the safety appliances considered in the foregoing and analogous cases, either work automatically, as couplers which operate by impact, or else are simple contrivances, as draw-bars and the like, which are the objects rather than the subjects of action, and when once placed in position remain intact and discharge their functions until changed by some active agency. A locomotive engine, on the other hand, however perfect its condition may be, in its operation calls for the continuous exercise of a high degree of skill and experience, and the constant supervision and attention of the engineer. In other words, the two classes of instrumentalities are so inherently diverse in character and use that rules which would be reasonable and appropriate in respect to the one class would be impossible of practical application to the other."

The judgment and order denying a motion for a new trial should be reversed and the complaint dismissed, with costs.

All concur.

COCHRANE, P. J.:

I agree with the views expressed by Mr. Justice McCANN. While the evidence may show a defective or imperfect lubricating condition, it is quite obvious that such condition did not render the engine unsafe " to operate in the service to which the same " was put or " in the active service of such carrier in moving traffic without unnecessary peril " within the meaning of the statute. For many hours before the accident the engine had been in use and there is no evidence to indicate that it might not have continued in use indefinitely without accident except for the peculiar combination of circumstances which existed. This is not a case where the accident occurred while the engine was being used to move traffic. It was at a standstill when the deceased descended therefrom to engage in the lubricating process. The accident would have occurred had the engine not been under steam. That is not controlling but it is important to consider in connection with accompanying circumstances. It is a matter of common observation that engineers frequently alight to oil their engines. This engine merely obeyed the natural law of gravity. It was on a grade with brakes released and wheels unobstructed. Any vehicle on wheels will run down hill if permitted to do so. If a workman had been engaged in tightening a bolt or cleaning or polishing the

engine or exercising any duty in connection therewith he might have been injured in the same way that the deceased was injured. I do not think, therefore, that the engine was not in proper condition or unsafe for operation within the meaning of the statute. Neither do I think that the defective condition of the engine, if such it may be called, was the proximate cause of the accident.

All concur.

Judgment and order reversed on the law and complaint dismissed, with costs.