## Scott Kelly

### v.

## Virginia Electric and Power Company

Record No. 870909

June 9, 1989

Present: All the Justices

*Thomas W. Williamson, Jr. (Louis D. Snesil; Parker E. Cherry; Trent S. Kerns; Emroch & Williamson; Pursell, Cherry, Kerns, Abady & Seymour*, on briefs), for appellant.

*Lewis T. Booker (Matthew J. Calvert; Hunton & Williams*, on brief), for appellee.

Justice Compton delivered the opinion of the Court.

In this personal injury action, the dispositive question on appeal is whether the trial court properly ruled that the plaintiff was guilty of contributory negligence as a matter of law.

Appellant Scott Kelly, a professional painting contractor, was severely injured on October 14, 1985 in the City of Richmond while moving an aluminum ladder during the course of painting a gutter of an apartment building. The ladder contacted a 19,900 volt, uninsulated electrical distribution line owned and maintained by appellee Virginia Electric and Power Company (Vepco), a public utility.

In 1986, the plaintiff brought this action seeking recovery in damages for his bodily injuries against Vepco, alleging the defendant negligently positioned and maintained the high-voltage line in question. The defendant denied liability, asserting the plaintiff's conduct caused his injuries.

In April 1987, the case was tried to a jury on the issues of primary negligence, proximate cause, contributory negligence, assumption of the risk, and damages. The jury returned a verdict in favor of the plaintiff in the amount of $1.5 million. The trial court sustained defendant's motion to set aside the verdict, ruling that the plaintiff had failed to establish primary negligence and that the plaintiff was guilty of contributory negligence as a matter of law. We awarded the plaintiff this appeal from the May 1987 order entering judgment for Vepco.

When the verdict of a jury has been set aside by the trial court, the verdict is not entitled to the same weight upon appellate review as one which has received the trial court's approval. *Guill* v. *Aaron*, 207 Va. 393, 396, 150 S.E.2d 95, 98 (1966). But in considering the facts under these circumstances, "we accord the plaintiff benefit of all substantial conflicts in the evidence and all reasonable inferences that may be drawn from the evidence."

*Oberbroeckling* v. *Lyle*, 234 Va. 373, 378, 362 S.E.2d 682, 685 (1987).

Because of the view we take of the case, we will assume, without deciding, that defendant was guilty of primary negligence which was a proximate cause of the plaintiff's injuries. Therefore, we will summarize the evidence relevant to the issue of contributory negligence, employing the foregoing standard of review.

The plaintiff, 25 years of age at the time of the accident, had attended public schools in Chesterfield County. He had not graduated from high school but attained the equivalent of a high school diploma while serving about three to four years in the U.S. Navy. He was assigned to an aircraft carrier during that period and was attached to an "Aircraft Squadron" as an aircraft structural mechanic. He had no "connection with electricity" in performing his duties as a mechanic, according to his testimony.

Upon release from the Navy, the plaintiff "went into painting" because part of his duties in the Navy had been "painting the aircraft." He then worked for about three years for various employers as a painter. A month before the accident, he was hired by John Owens as an independent contractor to paint the exterior of the buildings in the apartment complex where the accident occurred. According to Owens, the plaintiff was a person of "average" intelligence.

The scene of the accident was to the rear of a three-story apartment building. The building was of brick and wood construction with windows and wooden balconies at each rear floor level. The ground area adjacent to the rear of the building was generally level, open, and grassy with a sidewalk running parallel to and near the rear wall.

A metal gutter ran along the edge of the roof at the top of the building and was connected to downspouts installed at intervals on the rear face of the building. The gutter projected over and beyond the rear of the structure.

The high-voltage line in question was strung generally parallel to the building between two poles located to its rear. Two other lines, a "neutral" power line and a cable television wire, were strung from the same poles below the high-voltage line.

Affixed to the top of one of the poles was a large, can-shaped transformer and a light for outdoor illumination. The lines, poles, transformer, and light were open and obvious, not obscured by any obstructions.

At the point where plaintiff's ladder touched the line, the horizontal distance from the gutter to the line was 10.75 feet while the horizontal distance from the rear wall of the building to the line was 11.60 feet. The distance from ground level to the point of contact with the line was 23.8 feet. The plaintiff was using a 32-foot extension ladder extended "up" 28 feet at the time of the accident.

The plaintiff's expert witness, an electrical engineer, testified that the high-voltage line was "too close to the building, and that it should have been covered with a solid, insulating plastic or rubber . . . which would have prevented . . . the escape of electrical current from the metal inside to anything touching that covering on the outside." Describing the effect of contact with the high-voltage line, the expert said, "It would form a new circuit for current to come from the wire and enter and flow through whatever object was in the path and then flow into the earth and return back to the feeder circuit." According to the witness, if the current flows through a human body, it "produces a certain heating effect in the tissues of the body which burns the tissues."

The expert further testified that the position of the line in question met the minimum standards of the National Electrical Safety Code, a publication which furnishes "guidelines for electric companies and those . . . in control of electric facilities [on] how to construct, operate and maintain those facilities to insure public safety or to insure the safety of persons." The Code required a minimum horizontal clearance of 10.34 feet from the line to the face of the building and a vertical clearance above the ground of 17.34 feet. The expert also testified, however, that local conditions, such as the likelihood of persons working in the area using ladders to maintain nearby buildings, often require that the Code minimum distances be exceeded in order to comply with the industry standard. Here, according to the expert, defendant violated industry standards because local conditions required "a greater distance from the building to that wire."

The accident happened about 2:00 p.m. on a clear, sunny day with no wind. During the period the plaintiff had worked at the apartment complex, he "had virtually finished all of the buildings" except for painting several gutters.

On the morning of the day of the accident, a helper assisted plaintiff to lift the ladder "up in between the building and the lines." In order to provide "a safe incline to climb up," the plain-

tiff placed the foot of the ladder 7.5 feet "away from the building."

According to the plaintiff, he "pivoted onto the building." Beginning on the left end of the building, as one faces its rear, the plaintiff commenced painting the gutter using a spray gun. Because he "could only paint approximately four feet" of gutter from one positioning of the ladder, the plaintiff "would have to come down" and move the ladder "to the next spot." He had moved the ladder "twenty-five times" that day before he "came in contact with the line."

The plaintiff said that he observed the series of lines strung between the poles and he "felt sure" that the uppermost wire "was a telephone line." It "appeared to be insulated," and because "there was a cable line running beneath," this led him to believe "they were insulated telephone lines." The plaintiff testified that if he had known "they were high-voltage lines of any type," he would have used a "non-conductable fiberglass ladder" which he "could have borrowed from any number of contractors that [he] worked with." He said no one told him or warned him that he was near "an uninsulated 19.9 KV cable." In addition, the plaintiff said he "had no idea" the object on the pole was a transformer because he did not "know enough about electricity to tell you what a transformer is." He did not recall observing the light on the pole.

Immediately before the accident, the plaintiff was engaged in moving the ladder without assistance along the building to paint another section of gutter. Prior to moving the ladder, he would look from the ground up to "make sure" he would not "hit an obstruction." Then he would move the ladder, fully extended, along the building, in his words, "by pulling the ladder to me, putting my left hand on one of the bottom rungs, and my right arm up on one of the higher rungs, tilting it in, turning my body to the right, keeping the ladder parallel to the building." Then, he said, "I would proceed to move the ladder approximately four feet at a time to the next spot." He would lift the ladder "up approximately a foot" while moving it.

The plaintiff said that he "looked up every time before [he] pulled that ladder off of the building and moved it" because he "did not want to damage the line." Due to the manner he handled the ladder, the plaintiff said he would actually use his "body as leverage to keep it up." The plaintiff estimated the ladder was "within

two to three feet of the line at all times" when he was moving to another position.

He described the accident as follows:

"I looked up, I footed the ladder, I pulled the ladder back into the proper carrying position, I turned my head to the right, I started to take a step, and my ladder came in contact — I don't know — I went blind. It hit, the ladder hit — I mean, I don't know what happened. All I know, I was starting to take a step, and the next thing I know I heard somebody yelling . . . ."

The plaintiff testified that he considered himself "to be a well-qualified, capable, professional painter" and that he knew before the accident that electricity was dangerous. He also was aware that electricity could kill or seriously injure one who contacted an electrical wire and that an aluminum ladder conducted electricity. He said that before the accident he "always watched out" to avoid contact with a high-voltage, overhead electrical line. The plaintiff also testified that when he was working around electrical lines he would use a fiberglass ladder because he knew that it would not conduct electricity. He said, however, that "I thought they were overhead telephone lines so, therefore, I thought they were insulated. They looked insulated and I didn't believe [I needed] a fiberglass ladder."

The plaintiff knew that another painter was working at the end of the building at the time. But, according to plaintiff, it would have been "senseless" to ask him for assistance in moving the ladder "in a situation like that."

Also, the plaintiff, when asked why he moved the ladder when it was fully extended, testified that it "would be totally senseless" and not "feasible" to "take the ladder down." He pointed out "you would have to climb up the ladder, and you have to unhook it, and you would have to bump it down the side of the building by yourself." This could not be done, he said, "because they had windows on the building." Finally, he stated, "it is perfectly safe to move a ladder in the manner I was speaking of."

On appeal, principally relying on *Virginia Electric and Power Co.* v. *Winesett*, 225 Va. 459, 303 S.E.2d 868 (1983), *Virginia Electric and Power Co.* v. *Mabin*, 203 Va. 490, 125 S.E.2d 145 (1962), and *Northern Virginia Power Co.* v. *Bailey*, 194 Va. 464,

73 S.E.2d 425 (1952), the plaintiff contends the trial court erred in ruling that he was contributorially negligent as a matter of law. We do not agree.

■ At the outset, elementary rules should be reviewed. Ordinarily, the issue of contributory negligence is a question for the jury. Nevertheless, when persons of reasonable minds could not differ upon the conclusion that such negligence has been established, it is the duty of the trial court so to rule.

■ At trial, the defendant has the burden to prove by the greater weight of the evidence that the plaintiff was negligent and that such negligence was a proximate cause of the plaintiff's injuries. Contributory negligence, however, may be shown by the defendant's evidence or by the evidence of the plaintiff.

■ On appeal, the defendant's burden is heavier; it must show "that there is no conflict in the evidence of contributory negligence, and that there is no direct and reasonable inference to be drawn from the evidence as a whole, sustaining the conclusion that the plaintiff was free of contributory negligence." *Virginia Electric and Power Co.* v. *Wright*, 170 Va. 442, 448-49, 196 S.E. 580, 582 (1938). *Accord Winesett*, 225 Va. at 464, 303 S.E.2d at 872.

■ The Court has recognized for years "that the danger of electrical energy is a matter of common knowledge to all persons of ordinary intelligence and experience." *Watson* v. *Virginia Electric and Power Co.*, 199 Va. 570, 575, 100 S.E.2d 774, 778 (1957). And, while those engaged in the distribution of electrical energy must use a high degree of care in order to prevent injury to others, one who is guilty of negligence which efficiently contributes to his injuries is not entitled to recover damages for such harm. *Smith* v. *Virginia Electric and Power Co.*, 204 Va. 128, 132-33, 129 S.E.2d 655, 659 (1963).

■ In the present case, the plaintiff strenuously contends that he had no knowledge of electricity, and that he did not know the line carried high voltage or was uninsulated. Under these circumstances, however, this subjective evaluation of the situation will not excuse the plaintiff's conduct because it must be measured by the objective standard of a reasonable, prudent person. Applying this standard, the crucial question is whether the plaintiff knew or should have known of the potential danger confronting him.

The jury has accepted the plaintiff's testimony that he did not know the line was a high-voltage, uninsulated wire. Indeed, the

plaintiff's expert, who examined the line, said he "couldn't tell from looking at the wire itself" whether it was insulated. He said it was "a darkened wire," and did not "look like a brand new, shiny, silvery wire." But, acting as a reasonable, prudent person, should the plaintiff have known of the potential hazard under these circumstances?

The plaintiff was a person of average intelligence who, while in the armed forces, had been entrusted with the hazardous job of working on and around aircraft aboard a warship. He admitted his general knowledge of the danger of electricity. As an experienced painter, he said, he routinely was on the lookout for all potential dangers on the job site. As a matter of fact, one of the plaintiff's witnesses, who was also a painting contractor, agreed that painters, as a matter of general knowledge, "watch out for overhead lines."

Yet, with the foregoing degree of intelligence and experience, the plaintiff proceeded to work beneath, above, and around an array of wires strung between huge poles. The photographic exhibits show that the poles were those commonly identified as poles supporting power lines. The large transformer and light, with wires attached, also should have conveyed to any reasonable person the idea that electrical power was transmitted to and from the poles. Nevertheless, confronted with a situation which was open, obvious, and in plain view, the plaintiff undertook to manipulate an aluminum ladder within three feet of the wire twenty-six times in a three-hour period.

The plaintiff dwells on the fact that the wire was uninsulated in an attempt to excuse his conduct. Implicit in this contention is the admission that, were the line insulated, it would have been safe to run the risk of touching the insulated line with a metal ladder, reckless conduct in itself.

And there is more. A reasonable, prudent person, working under these conditions, would have had sufficient apprehension about the situation that he would have employed a fiberglass ladder, which was readily available to the plaintiff had he taken the time to procure it. Moreover, the extension ladder could have been lowered which, as the trial court observed, was "admittedly cumbersome and slow, but sure to avoid line contact." Indeed, the other painter, working at the end of the building, was available to assist plaintiff in jockeying the ladder. Furthermore, a simple inquiry from the resident manager of the apartment complex, or

other knowledgeable person in the area, would have disclosed the presence of the power line. The plaintiff took none of these precautions and recklessly proceeded on the assumption the wires were telephone lines without any competent basis for making such assumption. As the trial court pointed out, due care demands that a person balancing a metal ladder in proximity to lines strung from power poles should either determine that the lines are not dangerous, or treat them as if they are dangerous.

■ In sum, we hold there is no conflict in the evidence that the plaintiff, judged by the prudent-man standard, should have known of the potential danger of the situation and, further, that no direct or reasonable inferences may properly be drawn from the evidence as a whole sustaining the conclusion that the plaintiff was free of contributory negligence. *Smith*, 204 Va. at 133-34, 129 S.E.2d at 660; *Watson*, 199 Va. at 576, 100 S.E.2d at 779.

■ And the cases principally relied on by the plaintiff do not dictate a contrary result. They are factually inapposite. In *Winesett*, the Court affirmed the trial court's action in entering judgment on a verdict for the plaintiff, whose decedent was killed while using a power saw to clear tree limbs from among overhead lines. There, unlike the present case, the deceased worker did not testify. The Court held that the jury could have inferred that the decedent did not know, *and had no reason to know*, that the lines, one of which was an uninsulated high-voltage distribution line, presented any danger. 225 Va. at 466-67, 303 S.E.2d at 873. Here, the plaintiff, based on the record including his own testimony, had *every* reason to know the danger presented by this situation.

In *Mabin*, the Court also affirmed a trial court which had entered judgment on a plaintiff's verdict. But there the plaintiff was a totally uneducated day laborer who had no knowledge or experience whatever with electricity. The Court held that a jury could infer the plaintiff had no reason to expect a line strung several feet above the roof where he was working to be an uninsulated high-voltage line. Also, the Court said the jury could infer that his contact with the wire was not due to his negligence but resulted from his unintentional "raising up" combined with the effect of the wind on the wire. 203 Va. at 494, 125 S.E.2d at 148. No such facts are present here.

■ Finally, in *Bailey* the Court also affirmed the action of the trial court in entering judgment on a plaintiff's verdict. There, the

plaintiff's decedent, working in an apple orchard pruning trees, contacted a high-voltage, uninsulated power line. But in that case, unlike the present case, the jury could have inferred that the deceased worker "slipped, staggered or stumbled" while moving downgrade on wet grass immediately before his ladder struck the line. 194 Va. at 472, 73 S.E.2d at 430. Those facts cannot be inferred from the evidence in the present case. When asked whether he slipped or stumbled, the plaintiff responded: "I may have stumbled or my foot may have slipped. I don't know. I don't know what happened." A jury is not permitted to infer in the complete absence of other proof that a plaintiff stumbled when he positively testified that he did not know whether or not he stumbled.

For these reasons, the judgment in favor of Vepco will be

*Affirmed.*

Justice Russell, with whom Justice Stephenson joins, dissenting.

The issue of contributory negligence in this case was properly submitted to the jury and was resolved in the plaintiff's favor. In my view, it cannot properly be determined as a matter of law.

The resolution of the issue depends upon whether the plaintiff took such precautions for his own safety as a reasonably prudent person would have taken in like circumstances. In making that determination, the jury had the following facts to consider.

The bare 19,900 volt wire which caused the plaintiff's injuries may have had a shiny, bare-metal appearance when installed, years earlier, but it had oxidized with the passage of time, causing it to darken. An electrical engineer, who examined it, testified, "I couldn't tell from looking at the wire itself until I looked at its points of connection to the insulators to make sure that — whether or not it had some solid material wrapped around it such as plastic or rubber."

The plaintiff was not an electrical engineer, but was a 25-year old self-employed house painter. He testified that the wire appeared to him to be an insulated telephone line. The other wires attached to the same poles were obviously insulated and he saw no evidence of danger. Although these lines ran within 11 feet of the gutter he was painting, there were no signs posted in the area to

give warning that one of the wires carried 19,900 volts and that it was bare metal.

Whether the plaintiff's conduct was reasonable in light of those facts was an issue peculiarly within the province of a jury. An impartial, properly instructed jury weighed the evidence and gave an affirmative answer. Unlike our English cousins in the common law, we adhere to the jury system in civil cases precisely because reasonable persons may differ upon such questions. I think the trial court erred in setting the verdict aside and would reverse and reinstate the jury's verdict.