JOSEPH M. STOVER

V.

NORFOLK AND WESTERN RAILWAY CO.

Record No. 940659

March 3, 1995

Present: All the Justices

Raymond H. Strople (Kevin P. Bilms; Moody, Strople & Kloeppell, on briefs), for appellant.

Daniel S. Brown; Frank K. Friedman (Leslie E. Hagie; Woods, Rogers & Hazlegrove, on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

On September 11, 1990, plaintiff Joseph M. Stover was working for his employer, defendant Norfolk and Western Railway Company, as a member of a train crew when he was injured while operating a safety device affixed to a railroad track near Rocky Mount, Virginia. The plaintiff filed the present action against defendant under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, seeking recovery in damages for his injuries. The plaintiff alleged the injuries resulted from defendant's negligence in failing to properly inspect and maintain the device.

During a four-day trial by jury, the court below denied defendant's motions to strike the plaintiff's evidence made at the conclusion of the plaintiff's case-in-chief and at the conclusion of all the evidence. The case was submitted to the jury on issues of primary negligence, contributory negligence, proximate cause, and damages. The jury found in favor of the plaintiff and fixed his damages at $500,000.

The defendant filed a motion to set the verdict aside, and the court asked that the trial transcript be prepared. Upon review of the transcript, and upon consideration of argument of counsel, the court granted defendant's motion. We awarded the plaintiff an appeal from the February 1994 order entering judgment for the defendant.

Although numerous questions raised by the assignments of error and cross-error have been debated, one issue is dispositive of the appeal, *viz.*, whether the trial court erred in setting the verdict aside upon the ground that the plaintiff failed to prove defendant's primary negligence.

■ When the verdict of a jury has been set aside by the trial court, the verdict is not entitled to the same weight upon appellate review as one that has received the trial court's approval. Nonetheless, when considering the facts under these circumstances, the appellate court will grant the party prevailing before the jury benefit of all reasonable inferences that may be drawn from the evidence and of all substantial conflicts in the evidence. *Kelly* v. *Virginia Elec. and Power Co.*, 238 Va. 32, 34, 381 S.E.2d 219, 220 (1989). We shall relate the facts in accord with these settled rules.

On the day of the accident, plaintiff, age 49, was employed by defendant as a brakeman in a four-man crew that included an engineer, a conductor, and another brakeman. He "was working

the local" that travelled from Roanoke to Winston-Salem, North Carolina, switching, transferring, and picking up railroad cars at private sidings.

About 1:30 p.m., the train approached a spur track near "MW Distributors" at Rocky Mount to leave a car there. Plaintiff alighted from the train, and unlocked a switch allowing the engine and cars to travel from the main track onto the spur. He then walked a short distance along the spur to operate the device in question so that the units could roll farther into the siding.

The device, hand-operated and made of iron, is designed to prevent railroad cars from entering a main line from a side track. When the device is "on," a 90-pound portion, called the "derail," rests on top of one rail causing cars that may be rolling on a side track to "derail themselves off into the ground."

The device has three components: a housing, the derail, and an operating stand "with a handle on it." The housing lies between and below the top of the rails, adjacent to one rail; it is affixed to parallel cross-ties that are perpendicular to the track and that rest on roadbed ballast. The operating stand is affixed to the same ties on the opposite side of the rail.

In order to operate the device, an individual must stand beside the track and remove a lock securing the handle. According to a written railroad rule that provides "how the trainman, brakeman or whoever, is supposed to operate" the device, the person should face the device, "and with knees bent, grasp operating handle with both hands; lift and move handle." Testimony revealed that the tip of the operating stand handle (lever) must be lifted about six inches "into an up position to free the locking mechanism"; when the lever is fully lifted, there is a clearance from the locking mechanism of between ¼ and ⅜ of an inch. Then, in order to "throw the derail, you move the handle to your right when facing the derail, and it should move in the neighborhood of two feet." If the lever is not lifted at least four inches, the locking mechanism will not be cleared, and the lever is prevented from moving to the right to operate the derail.

The operating stand is designed to give a five to one mechanical advantage when manipulating the derail. Thus, "the amount of force in pounds would be one-fifth the weight of the derail plus possibly a small amount for any friction that might be in the metal surfaces that operate against each other." In other words, approximately 18 pounds of force is needed to move the derail

from its position on the rail down into the "off" position in the housing, which guides "the derail up and off the rail to below track level" in response to the horizontal, left-to-right movement of the handle.

The plaintiff, who had worked for railroads for approximately 25 years and who operated the "derails" in the Rocky Mount area on "a daily basis," testified that the accident happened in the following manner; he was the only eyewitness to the incident. Plaintiff said, "I lined the switch and went down and took the lock out, laid it down and went to throw the derail. I pulled up on it and was trying to move it from left to right and it hung." Plaintiff continued, "I reached back to give it another jerk and added more pressure. When I did, it just flopped. I felt a sting in my neck. I didn't think too much about it at the time, went on working." Plaintiff had successfully taken the derail "off," and it was put back "on" by the other brakeman in the normal course of his duties with "no problem." Shortly after the incident, numbness developed in plaintiff's arm and hand, and he reported the incident to the engineer shortly after the train departed Rocky Mount.

Plaintiff testified he "never" had one of "these levers hang" on him prior to this incident. He stated that he "had no idea what caused it to hang up" and that it could have been "a burr on the metal that broke loose."

Plaintiff was asked whether he had raised the handle high enough to free it of the groove in the locking mechanism. He responded, "That is exactly right" to a prior statement he made as follows: " 'But I thought I had it all the way. I might not have had it up all the way. I do not know, and all I know is it hung.' " He agreed that the handle must be raised "all the way up before it unlatches."

The plaintiff contended that the device had not been properly maintained by defendant. Specifically, he sought to prove negligent failure to lubricate the device.

Plaintiff testified that on the day of the accident he examined the device after he "tried to throw it" and saw no lubrication "whatsoever." He stated that he had complained to defendant's supervisory personnel on "a number of occasions" and asked that "switches and derails" be lubricated or serviced. He said that during his years of working on the track in the Rocky Mount area, defendant customarily refused to lubricate "its switches and derails" until there was a complaint of malfunction. He stated, how-

ever, that prior to the date of the accident he had not made any complaint or report about lack of lubrication or operation of the particular derail allegedly causing his injury. The evidence showed that lubrication has "nothing to do with that process of how high" an operator must lift the lever in order to activate the derail.

Over defendant's objection, the trial court permitted George Louis Hockaday to testify for the plaintiff as an expert witness. Hockaday is a cattle farmer from Providence Forge, Virginia, and supplements his income by "doing consulting work" for the plaintiff's attorneys. Hockaday, who worked for the C & O Railroad from 1957 to 1977, is retired from a railroad union organization. He was offered by the plaintiff as an expert in maintenance of railroad tracks and "track-related appliances," including switches and "derails." As a part of his duties with the C & O, he had been responsible for determining whether "derails" were installed and maintained properly. His last railroad employment had been "over 14 years" before trial, and he had last installed a "derail" more than 20 years before trial. Often during his testimony, the witness used the generic term "derail" to refer to the whole, three-component device.

The expert's opinions were based on review of depositions of one of defendant's trainmasters and one of its track supervisors as well as color photographs of the exterior of the device in question. The witness had not talked with the plaintiff, although he reviewed plaintiff's deposition after he had formed his opinions. He had not been to the site of the accident, had never seen the device in question, and hence had never operated it.

Hockaday testified that railroads are required by federal regulations to inspect any "derail" monthly "to see whether it had lost motion in the pins, to see if it was properly lubricated, and see if it operated properly." He said there was no "requirement that the derails be lubricated on any sort of regular basis," but that they "have to be thrown on a monthly basis." The witness opined that poorly lubricated "derails" will "hang up" because when "you take two pieces of iron that are placed together and they are exposed to the elements they are going to rust, freeze, or gaud up if they are not used."

The expert said that when "you are throwing a derail to get it off the track you have to raise it up out of a notch," which is inside the housing. He stated that according to custom and practice in railroad maintenance, the notch "is supposed to be lubrica-

ted with grease or oil or . . . graphite." He said there are no springs, rollers, or bearings that operate with the lever to lift the derail from the track; a connecting rod "goes from the stand, pushes against the derail itself in the middle, and that in turn forces it up over that notch by sheer strength and when it gets up to that point then it dips." Hockaday referred to other parts of the device, such as bearings and "pins" that required lubrication; he said that the photographs did not "show any indication whatsoever that there has been any lubrication put on the pins themselves" and that the track supervisor stated in his deposition that "he did not lubricate it."

The witness said that failure to lubricate "derails" until "somebody called in a complaint" is poor "railroad practice" because when they are not maintained on a regular basis "they do get hard to throw and they are subject to cause injury." Referred to testimony that the device in question was tested and "thrown" numerous times by defendant's employees immediately after the accident and that no "problem" was experienced "either getting it off or getting it back on," Hockaday said that such circumstance did not "surprise" him. He opined that once "you break it loose" from rust or a "rough place," the more frequently the device is thrown "the easier it gets."

During cross-examination, the expert agreed that, in order to determine the presence of lubrication within the device, the lever must be moved "halfway over to cock that derail up off the rail" so that it can be examined from the side, and that the photographs give no "indication at all whether or not that derail inside the housing has been lubricated." Recognizing that the lever in question was new, the witness did not know whether it came from the manufacturer prelubricated.

The defendant proved that the operating stand component of the device in question had been replaced and a new stand installed during the month before the accident. This stand had been "prelubricated at the factory" on an "eyebolt" or "crankeye" located on the stand's bottom prior to painting. No other surfaces on the stand are lubricated, and the manufacturer does not recommend such lubrication. This lubrication is "difficult" to observe from the photographs, according to defendant's proof.

Defendant showed it customarily lubricated the derail components "as needed" when notified of a "problem" either by train crews or inspectors. Siding tracks are inspected every 30 days. No

reports of any malfunction of the device in question had been received by defendant before plaintiff's accident.

During the late afternoon of the day of the accident and after having talked with the plaintiff, defendant's employees inspected the device and operated it; the device functioned "[e]xtremely easily" and without difficulty. Four trainmen "threw it" 25 times each and "it did not at any time hang up or have any problems." Two days later, two of defendant's employees examined the device again, "and still nothing was found wrong with it." No lubrication was applied to the device either immediately after the accident or within 30 days thereafter. During the 30-day period, the device was operated without difficulty numerous times by defendant's employees.

On appeal, plaintiff contends that the trial court erred in setting aside the jury's verdict as "reasonable people could conclude from the evidence and inferences from the evidence that Stover properly operated the derail, that the derail hung up because of lack of lubrication by Norfolk & Western and that Stover was injured as a result." We do not agree.

■ "What constitutes negligence for purposes of the FELA is a federal question, and federal decisional law formulating and applying the doctrine governs in cases in state courts." *Norfolk and Western Ry.* v. *Hodges*, 248 Va. 254, 260, 448 S.E.2d 592, 595 (1994). "Under the FELA, a plaintiff's proof must 'justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'" *Id.* (quoting *Rogers* v. *Missouri Pacific R.R.*, 352 U.S. 500, 506 (1957)). Even though that question ordinarily should be decided by a jury, in rare cases "where fair-minded persons cannot differ on whether the employer was at fault and whether that fault played any part in the employee's injury or death, the question becomes one for the court." *Id.* This is such a case.

■ Even under the FELA, an employee still has to prove that the employer was guilty of some act of negligence in order to recover. *Norfolk and Western Ry.* v. *Hughes*, 247 Va. 113, 116, 439 S.E.2d 411, 413, *cert. denied*, ___ U.S. ___, 114 S. Ct. 2136 (1994). The essence of the plaintiff's testimony is that, as he was lifting the lever to clear the locking mechanism, it "hung" causing him to use additional force to accomplish the horizontal movement of the lever. He said that he "had no idea what caused it to

hang up." With candor, the plaintiff states on brief that without Hockaday's "expert testimony, a jury would have no basis for determining the cause of Mr. Stover's injury."

█ Thus, keeping in mind settled evidentiary principles, we must analyze the expert's testimony to determine whether the trial court correctly concluded that it "simply fails to furnish a bedrock of fact upon which an opinion of negligence could have been predicated," and it "is indeed cobbled together based upon layers of surmise, conjecture and inference."

█ Opinions of expert witnesses must be based either upon facts within the expert's own knowledge or upon facts established by other evidence in the case; otherwise, the opinions are speculative and possess no evidential value. *See Gilbert* v. *Summers*, 240 Va. 155, 160, 393 S.E.2d 213, 215 (1990). Such statements violate the fundamental rule that an inference cannot be based upon an inference; a verdict resting upon such foundation is merely the fruit of conjecture, and cannot be sustained. *Virginian Ry.* v. *Andrews*, 118 Va. 482, 489, 87 S.E. 577, 580 (1916). Indeed, although it is within the jury's province to determine whether to accept an expert's testimony, the plaintiff must introduce evidence supporting a reasonable inference that the alleged defect was the "probable" cause of the accident as distinguished from a "possible" cause among other possibilities; otherwise, the verdict is based upon surmise, speculation, and conjecture. *Calhoun* v. *Honda Motor Co.*, 738 F.2d 126, 133 (6th Cir. 1984).

█ Under the FELA, the weight of the evidence must be more than a scintilla before the case may be properly left to the discretion of the jury. *Brady* v. *Southern Ry.*, 320 U.S. 476, 479 (1943). If, without weighing the credibility of the witnesses, the evidence supports "but one reasonable conclusion as to the verdict," the court should decide the matter, thus saving the result "from the mischance of speculation over legally unfounded claims." *Id.* at 479-80.

Given the plaintiff's testimony that he had operated the device in question on "a daily basis" during the weeks before the incident without experiencing "any problem," he sought to establish through Hockaday that defendant's failure to lubricate the device caused it to "hang up." But the expert, who had general "experience in installing and maintaining derails and as a track inspector" of derails, relied on only two sources to reach conclusions about this particular device: a group of five photographs taken two

months after the incident and the deposition of defendant's track supervisor (the expert said that the only portion of the trainmaster's deposition to which he "paid attention" was the statement that the plaintiff "got hurt from the derail because of it hanging up").

The photographs of the exterior of the device do not show critical portions of the apparatus. Hockaday agreed that the photos "don't give you any indication at all whether or not that derail inside the housing has been lubricated." He agreed that the "only thing you know about from these pictures are the newly installed portions, the handle, and the connecting mechanism there." He based his assumption that the stand was not lubricated on the fact that he could not see lubrication in the photos, while the uncontradicted evidence established that the part arrived from the manufacturer prelubricated, a fact upon which he admitted he had no knowledge. In sum, he inferred that the working portion of the device had not been properly lubricated from the absence of visible lubrication on the exterior of the stand; this was an impermissible inference.

Furthermore, the deposition, not offered as an exhibit in the case, furnishes no support for the conclusion he expressed that lack of proper lubrication caused this particular device to "hang up." To buttress his testimony, he made the expansive assertion that "99 percent of the time" derails malfunction because of "poor maintenance or lubrication." The "significant" part of the deposition, according to Hockaday, was the track supervisor's statement that the derail was "old" and "still in place," and it had not been lubricated.

Even assuming the deposition testimony permits the expert to conclude that improper lubrication on critical internal parts of the device caused the injury, it does not furnish any support for the proposition that such condition was foreseeably dangerous. Reasonable foreseeability of harm is an essential ingredient of FELA negligence. *Gallick* v. *Baltimore & Ohio R.R.*, 372 U.S. 108, 117 (1963). Nothing in Hockaday's testimony indicates that defendant knew, or should have known, of any defect or malfunction in this particular device. Indeed, all the evidence shows defendant had no notice; the device was regularly inspected, no complaints were registered prior to the accident about its performance, and it functioned properly during the weeks before and after the incident. It was incumbent on the plaintiff to show that

defendant, with the exercise of reasonable care, could have discovered a defect in the device and remedied the situation. *Brown* v. *CSX Transp. Inc.*, 18 F.3d 245, 249-50 (4th Cir. 1994). *See Hughes*, 247 Va. at 117, 439 S.E.2d at 413. This the plaintiff, with Hockaday's assistance, failed to do.

Consequently, we hold that the trial court did not err in setting aside the verdict. Thus, the judgment in favor of the defendant will be

*Affirmed.*