# Norfolk and Western Railway Company

## v.

## Ralph R. Hodges

Record No. 931056

September 16, 1994

Present: All the Justices

*John D. Eure (James F. Johnson; Johnson, Ayers & Matthews,* on briefs), for appellant.

*C. Richard Cranwell (Tyler M. Moore; Cranwell & Moore,* on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

On September 9, 1987, appellee Ralph R. Hodges, the plaintiff below, was injured while working for appellant Norfolk and Western Railway Company, the defendant below, in the Huddleston area of Bedford County. The plaintiff brought this action against defendant under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, to recover damages for his injuries.

The plaintiff alleged that he was employed as a "gang signalman" on the day of the accident and was engaged in the removal of relay leads from a damaged relay system case. He further asserted that the defendant failed to provide a reasonably safe work environment for him and did not provide adequate safety devices that were properly operational to protect employees at the time. As a result of such carelessness and negligence, the plaintiff alleged, he was injured in the back, head, and neck when the doors of the damaged relay system case fell upon him. The plaintiff sought recovery in the sum of $4,759,312.00.

Responding, defendant denied the allegations of negligence. In addition, defendant affirmatively alleged that "plaintiff was guilty of contributory negligence with regard to any injuries and damages that he may actually have sustained."

During a five-day trial by jury in April 1993, the court, over defendant's objections, ruled that defendant was guilty of primary negligence proximately causing the accident and that plaintiff was free of contributory negligence. During consideration of the contributory negligence issue, the trial court described the question as "very close" and "awfully close." The case was submitted to the jury on the issue of damages only, and the jury returned a verdict for the plaintiff in the sum of $5 million.

Overruling defendant's motion to set the verdict aside, the trial court reduced the jury award to the amount sued for and entered judgment in that sum in favor of the plaintiff. We awarded the defendant this appeal from the April 1993 judgment order; we also awarded the appeal upon plaintiff's assignment of cross-error.

The defendant contends the trial court erred in entering summary judgment on the issues of primary and contributory negligence because the evidence was sufficient to submit those questions to the jury. The defendant also contends the court below erred in certain procedural and evidentiary rulings, and in refusing to set the verdict aside because it was excessive in amount. The cross-error deals with an alleged procedural error.

Initially, we shall address the negligence issues. The "established rule" under FELA jurisprudence is "that in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of a litigant against whom a peremptory instruction has been given." *Wilkerson* v. *McCarthy*, 336 U.S. 53, 57 (1949). Thus, in summarizing the evidence, we shall recite only the evidence and reasonable inferences to support the defendant's case upon both primary and contributory negligence. The only evidence on both issues was presented through witnesses called by the plaintiff; the defendant called no witness on those questions.

On September 5 and 6, 1987, a severe flood caused a stream next to one of defendant's sidings near Huddleston to overflow resulting in extensive damage to the railroad's facilities. The railroad's signal system controlling movement of trains was "blacked out" from loss of power. Defendant's supervisory personnel examined the flood damage to determine the necessary steps to place the signal system back into operation. The flood waters had damaged telephone poles and high tension electric lines supplying power to switches, signals, and the communication system. Many of the switches and signal cases were full of mud and water, and there were tree limbs and other debris on the tracks.

On September 7, damage in the area was reported to defendant's signal maintainer for the section of track near Huddleston. On September 8, the maintainer went to the area and found signal cases at the siding "laid completely down on their backs" from the force of the flood waters.

These signal cases were large, four-door, rectangular, metal cabinets measuring nine by six feet. Each case contained two compartments with metal shelves holding a number of removable signal relay units. There were two end doors and two interior doors. The interior doors were hinged at the center of the case. The end doors were hinged at each end of the case. The four doors opened outward to allow access to the compartments.

Normally, signal cases stand in an upright position. In that position, the vertical doors, weighing 66 pounds each, may be held open by a mechanism within the case at the top using a sliding arm and a tapered pin that drops, by gravity, into predrilled holes in the sliding arm's frame. This mechanism permitted a door to open 90 degrees, or 180 degrees so that an interior door would be flat against the adjacent door and an end door would rest parallel to the front of the case.

On September 9, the day of the accident and after the flood waters had receded, the signal crew of which plaintiff was a member was ordered to the Huddleston area to repair flood damage. Testimony showed that because tracks of railroads operating in Virginia tend to "follow along by riverbeds, rivers, and streams," a railroad ought to be aware that flooding "poses a hazard" to its operation. The evidence established that flooding of railroad facilities requires "an immediate response" and that nothing in defendant's job description of plaintiff's duties included "emergency response" as a task "expected of the signalman." The evidence further showed that while defendant required members of its signal crews to work "in flood conditions or emergency conditions," no specific training was furnished those employees "as to how to deal with a flood situation."

After plaintiff had worked during the morning at the west end of the damaged area digging up underground cables "to check" for cuts in the cable, volunteers were sought to go to the east end of the area, about two and one-half miles away, with a signal crew supervised by Tommy Topham. The plaintiff, who had no prior experience working in flood conditions, volunteered because the area where he had been digging was crowded with workers who "were practically beating each other with shovels in trying to dig in the same spot."

The plaintiff arrived at the east end with Topham's crew about mid-morning and began digging with several other workers "checking" cables for cuts. Topham and others were working on

overturned signal cases removing relays to be transported to Roanoke for repair. During the early afternoon, Topham asked the plaintiff to help "finish getting these relays out," so plaintiff began to perform that task.

As plaintiff approached the signal case in question, he observed that it was overturned and lying on a severe incline that sloped away from the railroad's tracks to the adjacent stream. "The bottom of the case . . . was up toward the track and the top was down toward the river," according to the plaintiff. The case was lying on its back along the slope so that the case's bottom was about 12 inches higher than its top. The two interior doors were standing open back to back at a 90-degree angle to the body of the case; the end doors were closed.

The plaintiff, who had worked in defendant's signal department for approximately 15 months before the accident, was familiar with signal cases, having installed them as part of his employment with defendant. The plaintiff was familiar with the gravity latching system for case doors and knew that the system was not designed to work for cases in any position except upright.

As plaintiff prepared to work in the overturned case, he observed the position of the standing doors and "didn't look around" to determine whether the person who opened them "had tied them off or not." Testimony indicated that doors standing at a 90-degree angle could be secured by wedging a piece of wood into the door mechanism or by wiring the door open. In addition, the door easily could have been removed entirely by using a hammer to "smack the bottom of that door." The evidence showed that a "very dangerous" condition would be created if the sliding arm and pin mechanism was used to hold open a door of a case lying on its back with its top lower than its bottom, because gravity would tend to pull the pin out. Doors opened 180 degrees would not be dangerous, however, even if the case were overturned.

In order to commence his work removing relays, plaintiff climbed inside the case. Facing one of the raised doors, he sat on the edge of a closed end door with his feet inside the case in an opening made by the raised door. The plaintiff, 35 years of age and about five feet seven inches tall, began cutting and removing relays, handing them to Topham. After working in the case alone for about 15 minutes, plaintiff was leaning into the case and twisting to his right to pick up a relay, which weighed about 12 pounds, "to bring it out." He felt the case "shake" and suddenly

"it was all dark and that was it." Concluding that he had been struck by one or both doors, he said that "it was like getting hit with a baseball bat up side your head, it was just a sudden blow," pushing him down into the case. He testified that he did not know what caused the door or doors to close, he did not "hit" the door latch or the standing door, he assumed the door facing him fell, and he did not know what happened to the other elevated door. No testimony was presented by any eyewitness to the accident nor was there any definitive evidence upon precisely what caused the door or doors to fall.

The blow caused injury to plaintiff's back in the cervical and lumbar areas that necessitated, according to plaintiff's medical evidence, surgery to fuse vertebrae in those areas. In addition, plaintiff developed emotional problems after the accident and, at the time of trial, "he was considered as incapable of substantial gainful work activity."

On appeal, the defendant contends that when the evidence on the issue of primary negligence is viewed in the light most favorable to the railroad, a jury issue was created and the trial court erred in ruling on that question as a matter of law. We do not agree.

What constitutes negligence for purposes of the FELA is a federal question, and federal decisional law formulating and applying the doctrine governs in cases in state courts. *Urie* v. *Thompson*, 337 U.S. 163, 174 (1949). Under the FELA, a plaintiff's proof must "justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers* v. *Missouri Pacific R.R.*, 352 U.S. 500, 506 (1957). Ordinarily, that issue should be decided by a jury. *Id.* at 508. However, in the rare case where fair-minded persons cannot differ on whether the employer was at fault and whether that fault played any part in the employee's injury or death, the question becomes one for the court. *Borough* v. *Duluth, M. & I. R. Ry.*, 762 F.2d 66, 68 n.1 (8th Cir. 1985). This is that rare case.

Under the FELA, a railroad has a nondelegable duty to exercise reasonable care in furnishing its employees a safe place to work. *Atchison, T. & S. F. Ry.* v. *Buell*, 480 U.S. 557, 558 (1987). That duty is continuing and becomes more imperative as the risk increases. *Bailey* v. *Central Vermont Ry.*, 319 U.S. 350, 353 (1943). The employer must perform proper inspections to dis-

cover dangers in the place where employees are required to work, and after determining the existence of dangers the employer must take reasonable precautions for the employees' safety. *Williams* v. *Atlantic Coast Line R.R.*, 190 F.2d 744, 748 (5th Cir. 1951).

It must be remembered that the defendant offered no witnesses to rebut the plaintiff's proof of primary negligence. The uncontradicted evidence established that a major flood had occurred causing extensive damage to the railroad's facilities. Dozens of railroad workers were dispatched to the Huddleston area to assist in quickly reestablishing signal and communication service for the safe operation of trains. Obviously, the defendant, through its supervisors on the scene, knew of potentially hazardous conditions to be encountered by its employees.

The evidence and reasonable inferences concerning the events at the site of plaintiff's injury establish without dispute that the railroad breached its duties to provide the plaintiff with a safe place to work, to make proper inspections, and to take proper precautions to protect the plaintiff from potential dangers that the inspections may have disclosed. Topham, the defendant's supervisor on the scene where the injury occurred, apparently performed no inspection of the conditions at the overturned signal case. Instead, some employees were immediately put to work digging cables while he and other employees began removing relays from the case. Apparently, they opened the interior doors of the case, creating what was described as a "very dangerous" condition. The plaintiff, who had received no formal training by defendant about working in hazardous conditions, was ordered to work in and about a piece of equipment that posed an increased risk of injury in its damaged state. The defendant easily could have secured the doors in their 90-degree position using wood or wire, or could have removed them completely. Also, the defendant had one or more "boom trucks" in the area that could have been used to stand the overturned case upright before work commenced in it. Thus, we hold that the trial court did not err in entering summary judgment on the question of primary negligence.

Addressing contributory negligence, the defendant argues that reasonable persons could disagree whether plaintiff was negligent in any degree and whether such negligence was a cause of the accident. Thus, the defendant contends the trial court erred in refusing to instruct on that issue. We agree.

Under the FELA, "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." 45 U.S.C. § 53; *Norfolk Southern Ry.* v. *Rayburn*, 213 Va. 812, 816, 195 S.E.2d 860, 864 (1973). "Damages and contributory negligence are so blended and interwoven, and the conduct of the plaintiff at the time of the accident is so important a matter in the assessment of damages, that the instances would be rare in which it would be proper to submit to a jury the question of damages without also permitting them to consider the conduct of the plaintiff at the time of the injury." *Norfolk Southern Ry.* v. *Ferebee*, 238 U.S. 269, 273 (1915).

Contributory negligence "is a careless act or omission on plaintiff's part tending to add new dangers to conditions that the employer negligently created or permitted to exist." *Taylor* v. *Burlington N. R.R.*, 787 F.2d 1309, 1316 (9th Cir. 1986). "The question of how much of the injury is attributable to the employee's own actions and lack of due care for his own condition is to be decided by the jury if there is any evidence at all of contributory negligence." *Id.* at 1314.

Guided by these principles, and viewing the evidence and reasonable inferences in a light most favorable to defendant, we conclude there was ample evidence presented by the plaintiff from which a jury could find that he was guilty of some degree of contributory negligence. As plaintiff approached the signal case, he observed the piece of equipment with its top lower than its base, and with two heavy doors standing at a 90-degree angle to the case apparently supported only by the arm with the gravity mechanism. This was an unusual condition of which plaintiff obviously was aware. Additionally, he knew that the gravity mechanism was designed to hold the doors open properly with the case in an upright position. Thus, he should have realized that the gravity mechanism could not be relied upon to hold the doors open. He also knew that the doors could be opened 180 degrees so as to lie essentially flat and in a safe position.

Nevertheless, without examining the doors to see how they were secured, he proceeded to climb into the case, positioning himself immediately under the propped door, and began shifting heavy relays around within the case. If the plaintiff had taken the time to examine the hazardous condition, he could have taken simple

steps to secure the doors open with wood or wire before working inside the case. Even though the railroad had a duty to exercise reasonable care in furnishing its employees a safe place to work, this did not relieve the plaintiff from the duty to exercise reasonable care for his own safety. The plaintiff did not need special training to recognize a potentially dangerous situation created by an overturned signal case with open doors ordinarily secured with the assistance of gravity. The choice that plaintiff made, given his knowledge of the doors' gravity mechanism, to enter the case and expose himself to the propped doors added a new danger to the already hazardous situation.

Contrary to the plaintiff's argument, this conduct did not amount to assumption of the risk, a defense no longer applicable in FELA cases. *See* 45 U.S.C. § 54. Rather than being venturous, the essence of assumption of the risk, the conduct was careless, the essence of contributory negligence. *See Amusement Slides Corp.* v. *Lehmann*, 217 Va. 815, 819, 232 S.E.2d 803, 805 (1977) (assumption of risk has two requirements: nature and extent of risk must be fully appreciated and risk must be voluntarily incurred). The plaintiff did not voluntarily accept a known, understood, and fully appreciated risk that a signal case door would fall on him. On the contrary, he did not comprehend that he faced any risk whatever because he presumed the doors were secured, carelessly placing himself in a position where he could be struck by a falling door.

Because this case will be remanded for a new trial, we do not reach the other assignments of error or the cross-error. The remaining assignments of error involve whether the trial court erred in permitting a plaintiff's medical expert to testify regarding plaintiff's residual functional capacity when the plaintiff allegedly failed to reveal during discovery the substance of the expert's opinion; whether the trial court erred in permitting medical expert witnesses to recite opinions of other experts who did not testify; and whether the verdict was excessive in amount. The cross-error involves the trial court's alleged error in permitting a defendant's medical expert to testify even though the expert viewed before trial the videotaped trial testimony of two of the plaintiff's medical experts, when the witnesses at trial had been excluded from the courtroom under Code § 8.01-375. These precise issues are not likely to arise upon retrial and a ruling on them here would be merely advisory.

Accordingly, the judgment below will be reversed for the failure of the trial court to instruct on contributory negligence. The case will be remanded for a new trial, limited to the issues of contributory negligence and damages.

*Reversed and remanded.*