PRESENT: Lemons, C.J., Mims, McClanahan, Powell, Kelsey, and McCullough, JJ., and Russell, S.J.

NORFOLK SOUTHERN RAILWAY COMPANY

OPINION BY
SENIOR JUSTICE CHARLES S. RUSSELL

v. Record No. 180121

January 31, 2019

MARK A. SUMNER

FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
James J. Reynolds, Judge

This is an appeal by a railroad corporation from a judgment in favor of one of its employees in an action brought under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51 through -59, as amended.

FACTS AND PROCEEDINGS

In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the prevailing party at trial. Mark A. Sumner (the plaintiff) was an employee of Norfolk Southern Railway Company (the defendant), a corporation operating a railroad as a common carrier in interstate commerce.

On February 26, 2013, the plaintiff was working as the conductor of a northbound Norfolk Southern freight train running from Greensboro, North Carolina through Danville, Virginia and points north. The temperature was in the 30's and it was cloudy with light mist or rain. The yardmaster at Greensboro warned the train's engineer, Teddy Lester, that some ice might be encountered farther north. The engineer had orders to proceed through the railroad yard at Danville and stop at a point about two miles north of the yard where a side track called the "East Bradley pass track" diverged from the northbound main line. The train crew was

directed to make a "cut," a designated series of cars that were to be separated from the train and left on the side track to be picked up by another locomotive later for delivery to a nearby destination. The train's remaining cars were then to be reunited on the main line and continue northbound. The train was stopped on the main line at a point where the last car of the "cut" was just south of the switch to the side track.

As conductor, the plaintiff's duties required him to separate the last car of the "cut" from those to be left on the main line, to board the last car of the "cut," and, using his hand-held radio, to call the engineer to proceed. The locomotive then pulled the "cut" north of the switch to the side track and stopped on the conductor's signal. This part of the operation was performed without incident.

Thereafter, the evidence is entirely circumstantial as to the fall that resulted in the plaintiff's injury. The plaintiff had no memory of the event and there were no eyewitnesses to the fall. The conductor's duties required him to dismount the last car in the "cut" and walk south, away from the locomotive, turning off an electric timing device on the switch, and continue walking south nearly 200 feet to release the "derail," a protective device to prevent movement of cars on the side track. He would then return north to throw the switch and call the engineer to back the "cut" onto the side track.

After the plaintiff dismounted and began to walk south, the engineer expected a radio call from him but heard nothing. He called the plaintiff but there was no response. Concerned, he dismounted the locomotive and began walking south in the "walk path" that ran east of and parallel to the side track. Close to the east edge of the path was a steep embankment that dropped down a 70-degree slope into a ravine. Looking over the edge of the embankment, the engineer saw movement and recognized the plaintiff lying about 36 feet below. The engineer

2

climbed down to the plaintiff with some difficulty, using one hand to support himself. The plaintiff was lying on his back, with his head uphill. At trial, the engineer testified that the plaintiff was conscious but "very disoriented." The plaintiff said: "What are we doing here? What happened?" He complained of great pain in his shoulder and chest. He had bitten through his tongue. Using the plaintiff's handheld radio, which was lying nearby, the engineer called the Danville Yardmaster who in turn called a team of paramedics to come to the scene. The team tied the plaintiff to a "backboard," placed it inside a fiberglass "sled," and with ropes pulling from above and men pushing from below, hoisted the plaintiff out of the ravine.

The plaintiff was taken to the Danville Medical Center where he was treated for his injuries. At trial, two medical expert witnesses testified by video deposition. Steven Norris, M.D., an orthopedic surgeon, diagnosed the plaintiff with a displaced fracture of the clavicle (i.e., collarbone) and three fractured ribs. This required surgery on two occasions: the first to realign the fragments of the clavicle, to secure them with a metal pin, and the second to remove the pin when healing was well advanced. David Meyer, M.D., a neurologist, diagnosed a brain concussion. It was his opinion that this had caused the plaintiff to suffer amnesia, which destroyed his memory of the traumatic event itself and for the events during the period of time immediately preceding and following it. In some patients, he said, fragmentary recollections of these events would occur in later years, but others would never recall them. He testified that brain scans showed no condition that would have caused the plaintiff to have a seizure or spontaneous "blackout." The doctors found the plaintiff to be disabled by his injuries but able to return to work eight months after his fall.

The plaintiff brought this action in the Circuit Court of the City of Danville to recover damages under the FELA for his injuries. The case culminated in a three-day jury trial wherein

the jury found for the plaintiff and awarded him damages in the amount of $336,293. The court entered judgment on the verdict and we awarded the defendant an appeal.

At trial, the plaintiff testified that he had no memory of any events after he dismounted the train to begin his walk south. He said: "It's like somebody flipped a switch." He had no memory of his hospital stay. He testified that he later had a vague, dreamlike recollection of Teddy Lester, the engineer, looking down at him and of being placed on a "backboard." He said that continuous, accurate memory did not begin again until he was in therapy in July, five months after the accident. As stated above, there were no eyewitnesses to the fall.

The plaintiff called as an expert witness Raymond Duffany as an expert in "railroad engineering practices, including track construction, inspection, maintenance and repair, especially with respect to railroad walkways." There was no objection to his qualifications. He had a degree in Civil Engineering and had been working in the railroad industry since 1975 as a construction engineer, an executive and as a safety consultant. He examined the scene of the accident in 2015, two years after the plaintiff's fall. He went over the scene with Terry Lester, the engineer, and examined depositions of other witnesses and photographs of the scene taken at the time of the accident. He concluded that the conditions he observed were substantially unchanged from those existing at the time of the plaintiff's fall.

The East Bradley pass track ran parallel to, and just east of the Norfolk Southern northbound main line. The terrain on the east side of the pass track sloped downhill at an angle of 20 degrees to the walkway the railroad provided for its employees to walk between the switch to the north and the derail to the south. The walkway ran along the foot of this slope. The eastern edge of the walkway extended to a cliff that dropped at an angle of approximately seventy degrees into a ravine over 30 feet deep. No guardrail or other protection was provided to

prevent falls into the ravine. Both tracks, the 20-degree slope down to the walkway, and the walkway itself, were covered with "track ballast." These facts were undisputed at trial and were shown to the jury by photographs admitted into evidence.

Duffany testified that, at the point where the plaintiff had evidently fallen and gone over the edge of the embankment, the walkway was only 15 inches wide. At the north end, beside the switch, it was about 48 inches wide, but rapidly narrowed to 15 inches and remained at that approximate width all the way south to the derail. In his opinion, those conditions did not afford railroad employees a safe place in which to work. He testified that safety standards accepted by railroads throughout the country specify a minimum width of 24 inches for walkways.[1] He said that a walkway 24 inches wide "gives you that extra margin you have to recover from a possible fall or an area [in which] to fall [] other than over the cliff." He said that this is especially important when walking over ballast rock "which moves and tends to roll under foot traffic." A 24-inch walkway "give[s] you an adequate place to walk [and] if you do stumble on the ballast or trip, you have room to recover." The grade of a walkway, he testified, should be relatively flat, not exceeding seven to eight degrees in slope. For that reason, the area west of the walkway was unavailable to foot traffic as it sloped upward at an angle of 20 degrees. This state of affairs confined users of the walkway to a narrow and unprotected passage between the toe of the slope and the edge of the cliff.

Duffany also testified that the walkway was covered with "track ballast," defined as large crushed rock pieces 2 to 2 ½ inches in diameter used to support and stabilize the main line of the railroad. This large ballast is unsafe for foot traffic because of its tendency to roll or slide

---

[1]Duffany testified that these standards are specified by safety codes published by railroad safety engineering associations, are specified by safety manuals used by major trans-continental railroads and are codified into law in four states.

underfoot. Instead, he said that smaller pieces of crushed rock should be used in railroad yards and on walkways. This material, called "yard ballast," was about ¾ inch in diameter, compacted well, was stable, and made a smooth walking surface.

ANALYSIS

The FELA, 45 U.S.C. § 51, was enacted by Congress in 1908, and has since been amended to serve the humanitarian purpose of imposing on railroads engaged in interstate commerce as common carriers the duty to provide their employees a safe place to work. Railroad employees who suffer injuries or death, to which a breach of that duty contributed, even to the slightest degree, were granted a remedy by way of a civil action for damages against the employer. The federal and state courts were given concurrent jurisdiction to adjudicate such actions. 45 U.S.C. § 56.

What constitutes negligence under the FELA is a federal question and federal decisions govern such cases in state courts. *Norfolk & W. Ry. v. Hodges*, 248 Va. 254, 260 (1994). Because the statute is remedial in nature, it is liberally construed by the courts in favor of railroad workers. *Rodriguez v. Delray Connecting R.R.*, 473 F.2d 819, 820 (6th Cir. 1973).

Under the FELA, a railroad has a non-delegable and continuing duty to use reasonable care to furnish its employees a safe place to work. *Norfolk & W. Ry.*, 248 Va. at 260. The employer must perform inspections to discover dangers in the place where employees are required to work and after discovering the existence of dangers the employer must take precautions for the employees' safety. *Id.* at 260-61 (citing *Atchison, Topeka & Santa Fe Ry. v. Buell*, 480 U.S. 557, 558 (1987), and *Williams v. Atlantic Coast Line R.R.*, 190 F.2d 744, 748 (5th Cir. 1951)). Under the FELA, a breach of these duties constitutes negligence. The FELA also expressly excludes the traditional common-law defenses of contributory negligence and

6

assumption of the risk.[2]  Furthermore, a FELA plaintiff may carry that burden by proof that is

entirely circumstantial.  *Ackley v. Chicago & N. W. Transp. Co.*, 820 F.2d 263, 267 (8th Cir.

1987), *Norfolk & W. Ry. v. Johnson*, 251 Va. 37, 43 (1996); *Norfolk & W. Ry. v. Hodges*, 248

Va. at 260.  Indeed, the standard of proof in an FELA action is significantly more lenient than in

a common-law tort action.  *Norfolk & W. Ry. v. Hughes*, 247 Va. 113, 116 (1994).

The issue of proximate cause is also treated more leniently in FELA cases than in

common-law tort actions.  In *Rogers v. Missouri Pacific Railroad*, 352 U.S. 500, 506 (1957), the

Supreme Court held that an FELA plaintiff need only show, "with reason[,] that the employer's

negligence played any part, *even the slightest*, in producing the injury or death for which

damages are sought."  (Emphasis added.)  Ordinarily, the Court stated, that issue should be

decided by a jury.  *Id.*  *See also Norfolk & W. Ry. v. Chittum*, 251 Va. 408, 415 (1996), *Stover v.

Norfolk & W. Ry.*, 249 Va. 192, 199 (1995), *Norfolk & W. Ry.*, 248 Va. at 260.

At the conclusion of the evidence, the defendant moved the court to strike on the ground

that the evidence was insufficient to go to the jury.  The court denied the motion.

The court then gave instructions agreed upon by counsel as correct statements of the

applicable law, although the defendant preserved its objection to the court's ruling on its motion

to strike.  Among other things, the instructions told the jurors that there were two issues for them

to decide:  whether the defendant was negligent and if so, did that negligence play a part, no

matter how small, in producing the plaintiff's injury.  The jurors were told that they could use

their common sense in judging the evidence and could draw all reasonable inferences from it.

They were also instructed that the defendant had a continuing duty to afford the plaintiff a

---

[2] An employee's contributory negligence, however, may be considered by the fact-finder in fixing the quantum of damages.  45 U.S.C. § 53.

7

reasonably safe place to work and to maintain and keep it in a safe condition. A failure to perform these duties was negligence. As instructions given without objection, these instructions became the law of the case. *Online Res. Corp. v. Lawlor*, 285 Va. 40, 60-61 (2013).

On appeal, the defendant assigns two errors: (1) That the circuit court erred in admitting Duffany's testimony as it exceeded the scope of his expertise, was speculative and not based on facts in evidence "regarding how a wider walk path might have prevented some falls," and (2) That the court erred in failing to grant the defendant's motion to strike and motion to set aside the verdict because the evidence was insufficient to create a jury issue with respect to causation.

The admission of expert testimony rests within the sound discretion of the trial court and will not serve as a cause of reversal in the absence of an abuse of discretion. *Keesee v. Donigan*, 259 Va. 157, 161 (2000). Here, the defendant made no objection when Duffany was offered as an expert witness. Aside from a bare and conclusory assertion that Duffany's testimony exceeded the scope of his expertise, the defendant makes no argument and cites no authority to that effect on brief. That argument is therefore waived. Rule 5:27(d), *Palmer v. Atlantic Coast Pipeline, LLC*, 293 Va. 573, 580 (2017).

The defendant objected at trial to Duffany's testimony that a railroad walkway should have a minimum width of 24 inches to be safe and that the walkway at the point above which the plaintiff was found was only 15 inches wide and therefore not in compliance with industry safety standards. The court overruled the objection. The defendant's opening brief expressly waives that objection on appeal. The only remaining assertion that Duffany made bearing on causation was the danger of 2 ½ inch pieces of ballast rock shifting underfoot, leading to stumbling, tripping and possible falling. The defendant makes no challenge to this evidence on appeal. Moreover, to the extent that testimony fell outside the range of expert opinion, it was merely

declaratory of matters within the common knowledge and experience of the jury. There is no error in permitting a witness to refer to such matters and the jury was expressly instructed that it could rely on its common sense in considering any testimony. Accordingly, we find no merit in the defendant's first assignment of error.

There were two issues before the jury, negligence and causation. The second assignment of error, like the first, does not address negligence. The jury's finding that the defendant was negligent in failing to provide the plaintiff a safe place to work is, for that reason, not before us. The second assignment of error presents the question whether the evidence was sufficient to create a jury issue with regard to causation.

In FELA cases, causation may be proved by circumstantial evidence alone and does not require direct evidence. *Norfolk & W. Ry.*, 247 Va. at 116. The defendant's arguments on this question bring us to confront a significant difference between FELA cases and common-law tort actions.

The present case is one of a small but instructive group of FELA cases in which a railroad worker suffered injury or death while performing his duties where there were no eyewitnesses to the event. In *Lavender v. Kurn*, 327 U.S. 645, 648 (1946), a switch tender was found unconscious near a track. He soon died as a result of a fractured skull. *Id.* The injury was determined to have resulted from a blow to the back of his head from a small, round, hard, fast-moving object. *Id.* There were no witnesses to the event. *Id.* In the ensuing FELA action, the plaintiff introduced evidence that the injury was consistent with a blow to the head from a mail hook loosely dangling from the outside of a passing railroad car. *Id.* at 649. Evidence showed that if the decedent had been standing on a mound that was beside the track, the hook would have been in a position to strike his head. *Id.* The defendant railroad advanced the theory that

9

the decedent was murdered by tramps in the area. *Id.* at 649-50. The railroad contended that the evidence showed that the mound was too far from the track to permit the hook to strike the decedent. *Id.* at 650. The jury found for the plaintiff and the trial court entered judgment on the verdict. *Id.* at 646-47. The Supreme Court upheld the judgment, expressly holding that in FELA cases "[i]t is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference." *Id.* at 653. The Court acknowledged that there was evidence in the case sufficient to support the defendant's theory as well as the plaintiff's theory, but that the choice of the proper inference to be drawn was an issue for determination by the jury. *Id.* at 652-53.

An even greater "measure of speculation and conjecture," *id.* at 653, was required in *Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108 (1963). There, a railroad employee testified that while working on the railroad's right of way in a wooded, swampy area, he was bitten on the leg by a large insect which he crushed. *Id.* at 109. This occurred near a stagnant pool of putrid water containing dead vermin and birds, a condition that had existed for many years. *Id.* The bite resulted in an infected wound. *Id.* The infection did not respond to medication. It spread throughout his body and finally led to the amputation of both his legs. *Id.* None of his doctors could explain the etiology of his condition, but some of them characterized it as "secondary to an insect bite." *Id.* at 109-10. The jury found for the plaintiff and the trial court entered judgment on the verdict. *Id.* The Ohio Court of Appeals reversed on the ground that the evidence of causation was entirely based on the conjecture that the biting insect had come from the pool on the railroad's property, but it was also possible that it might have originated in any of several

10

other nearby contaminated sources that were not under the railroad's control. *Id.* The Supreme Court reversed and remanded, holding that the evidence was sufficient to frame an issue for determination by the jury. *Id.* at 116, 122.

Because the evidence of causation in unwitnessed cases is often entirely circumstantial and the result must depend on the inference to be drawn from the circumstantial evidence, the Supreme Court stated that it is not the function of an appellate court to search the record in such cases for conflicting circumstantial evidence "to take the case away from the jury on the theory that the proof gives equal support to inconsistent and uncertain inferences." *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944).

In *Bly v. Southern Ry.*, 183 Va. 162, 175 (1944), we cited *Tennant* in the year it was handed down, applying its holding in a case based on facts strikingly similar to those in the present case. There, a train stopped with its caboose on a railroad bridge. *Id.* at 165. The train's flagman was in the caboose. *Id.* It was his duty to dismount from the caboose and walk back a considerable distance to display a signal to warn any train approaching from behind of the presence of the stopped train on the bridge. *Id.* His body was found under the bridge from which he had fallen to his death. *Id.* at 166. The bridge provided no walkway on either side. *Id.* The only way to dismount from the caboose was by a flight of steps descending from the side of the rear of the caboose. *Id.* The lowest step extended two to three inches beyond the edge of the bridge. *Id.* Workers were expected to back down the steps, holding the left guardrail on the steps, and then to swing their bodies around to the rear of the caboose in order to find a footing. *Id.* The railroad presented expert testimony that the bridge met the safety standards prevailing in the industry. *Id.* at 167. The trial court granted the railroad's motion to strike the evidence on the ground the plaintiff's theories of negligence and proximate cause were entirely based on

conjecture. *Id.* at 169. Citing *Tennant*, we reversed, holding that the differing inferences that could reasonably be drawn from the evidence created an issue to be decided by the jury. *Id.* at 175-76. We continue to adhere to the construction of FELA that we expressed in *Bly*.

CONCLUSION

Because the issue of the defendant's negligence in failing to furnish its employees a safe place to work is not before us on this appeal, the sole question remaining is whether the evidence was sufficient to create a jury issue on causation. There was evidence to support the inference that the defendant's negligence played a part, however small, in causing the fall which was the source of the plaintiff's injury. The evidence may also have been sufficient to support an inference that the plaintiff's fall resulted from causes unrelated to the defendant's negligence. Under the settled principles governing FELA cases, that juxtaposition created a jury issue as to which inference should be drawn. *See Lavender*, 327 U.S. at 653 ("Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict [it] is free to disregard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."). Thus the present case is unlike *Norfolk & W. Ry.*, 247 Va. at 117, where we observed that "the record [was] devoid of any facts" to support an inference favorable to the plaintiff on a required issue.

Armed with a jury verdict in his favor, approved by the trial court, the plaintiff is entitled to have the evidence, and all the inferences that may reasonably be drawn from it, viewed in the

12

light most favorable to him, *RGR, LLC v. Settle*, 288 Va. 260, 283 (2014). He "occupies the most favored position known to the law." *Id.*

We find no error in the judgment of the circuit court and accordingly will affirm it.

*Affirmed*.

JUSTICE McCULLOUGH, with whom JUSTICE McCLANAHAN and JUSTICE KELSEY join, dissenting.

I respectfully dissent because, in my view, the plaintiff's evidence failed to establish the foundational "but for" causation that is required to establish the railroad's liability. Although the FELA has diluted the standard for *proximate* causation, a plaintiff must still prove "but for" causation. The plaintiff's theory was that the railroad was negligent in that it provided only 15 inches of level walkway instead of 24 inches, which, according to the plaintiff's expert, is the industry standard. The plaintiff theorized that the extra nine inches in width would have allowed the plaintiff to recover his step and avoid the fall. No evidence, however, supported this theory. No witness established where the plaintiff was standing or how he fell. There is, therefore, no basis in fact upon which a jury could draw an inference that the extra width would have spared the plaintiff from a fall, and the plaintiff thus failed to establish that "but for" the railroad's negligence, he would not have fallen.

I. THE FELA REQUIRES THE PLAINTIFF TO PROVE "BUT FOR" CAUSATION.

Causation is ordinarily a two-step inquiry. The first step is factual causation. "The requirement of factual causation is often described as the 'but for' or *sine qua non* rule. Generally a person is not liable to another unless[,] but for his negligent act[,] the harm would not have occurred." *Wells v. Whitaker*, 207 Va. 616, 622 (1966) (citing, *inter alia*, William L. Prosser, The Law of Torts 242 (3d ed. 1964)). The second step is proximate causation.

13

"Proximate cause has been described as a shorthand descriptive phrase for the limits the law has placed upon an actor's responsibility for his conduct." *Id.* (citing Prosser, *supra*, at 240). "But for" cause is a predicate of proximate cause; it does not add to proximate cause. Without "but for" causation, there necessarily can be no proximate causation.

While, as the majority notes, "[t]he issue of proximate cause is also treated more leniently in FELA cases than in common-law tort actions," *ante* at 7, the plaintiff's burden of proving "but for" causation remains intact. In *CSX Transportation, Inc. v. McBride*, 564 U.S. 685 (2011), the majority and dissenting Justices disagreed about the scope of the *proximate* cause standard under FELA. Writing for the majority, Justice Ginsburg stated that it is not accurate to characterize precedent from the United States Supreme Court as eliminating "the concept of proximate cause in FELA cases." *Id.* at 700. Rather, she wrote, "[u]nder FELA, injury 'is proximately caused' by the railroad's negligence if that negligence 'played any part . . . in . . . causing the injury.'" *Id.* In dissent, Chief Justice Roberts pointed out that nothing in the majority's language "requires anything other than 'but for' cause." *Id.* at 710 (Roberts, C.J., dissenting). What neither the majority nor the dissent contested, however, was that, despite a relaxed standard of proximate cause, the FELA retains the requirement that the plaintiff prove "but for" causation – that is, that the plaintiff's harm would not have occurred but for the negligence of the defendant. In fact, the Justices agreed that more than "but for" causation is required to prevail under the FELA. *Compare id.* at 699-700 (majority opinion) (noting that Supreme Court precedent does not allow "juries to impose liability on the basis of 'but for' causation") *with id.* at 706 (Roberts, C.J., dissenting) (noting that "[n]othing in the FELA itself" or the Court's precedent supports liability based on "but for" causation.).

14

II.     THE PLAINTIFF'S EVIDENCE UTTERLY FAILS TO PROVE "BUT FOR" CAUSATION.

No evidence established "but for" causation. Neither the plaintiff nor any other witness could testify about how the accident occurred. Sumner has no memory about his fall. No other witness was there to observe the fall. The plaintiff's expert opined that the level portion of the walkway was too narrow: it was 15 inches wide when it should have been, at a minimum, 24 inches wide. The plaintiff's expert was unable to provide a causal link between the narrowness of the walkway and Sumner's fall. He was asked the following question:

> Q.      You have no idea what role, if any, that that walk path
> could have played, he could have been looking over his shoulder,
> he could have been distracted, he could have been not paying
> attention, you have no idea, all we know is that he was walking
> south somewhere; isn't that true?
>
> A.      Correct.  [App. 150]

The plaintiff's theory was that a wider path would have provided an "extra margin . . . to recover from a possible fall." The evidence establishes only that the plaintiff fell. No evidence establishes where the plaintiff was situated when he fell. He could have been walking in the middle of the path, on the edge of the path, or off of the path altogether. No evidence establishes how he fell, or why he fell. From this evidence, a number of possible conclusions emerge:

- The plaintiff slipped, tripped, or stumbled in such a way that he pitched forward and fell with no opportunity to recover;

- The plaintiff fell because he lost consciousness due to some medical episode;

- The plaintiff was walking on the edge of the path such that the hypothetical extra width would not have helped him recover;

- The plaintiff was not walking on the level portion of the path at all;

OR

15

- The plaintiff was positioned in the path *and* slipped, tripped, or stumbled in such a way that the extra inches would, in fact, have helped him recover his step and he would not have fallen.

There is no evidence that justifies a factual finding that this final possibility is the correct one – that but for a few extra inches of width on the level portion of the path, the plaintiff would have recovered and would not have fallen down the embankment.

III.    PRECEDENT DOES NOT ABROGATE THE BEDROCK REQUIREMENT THAT A PLAINTIFF PROVE "BUT FOR" CAUSATION.

None of the cases cited by the majority supports a conclusion that juries may base a verdict on sheer speculation. In *Lavender v. Kurn*, 327 U.S. 645 (1946), a railroad employee, responsible for throwing switches in a railyard, was found dead with a fractured skull. *Id.* at 648. No witnesses observed what happened. The medical evidence was inconclusive. The doctor who performed the autopsy opined that the decedent's skull could have been fractured either from a blow to the head with a pipe or from a small round object. *Id.* at 648-49.

The railroad's theory was that the employee had been attacked by vagrants who were known to ride the rails. *Id.* at 649-50. The railroad pointed to the fact that the employee's unsoiled wallet was found about a block from the place where he had been found, and the wallet had no money in it. *Id.* at 650. However, the employee's diamond ring and watch were still on his person. *Id.* No evidence established that a vagrant, as opposed to someone else at the scene, took the money from the deceased.

The plaintiff's theory was that the decedent employee was struck by the curled end or tip of a mail hook that protruded from the train as the train was backing up. *Id.* at 649. There was conflicting evidence about the position of the decedent's body and the height at which the decedent plausibly might have been standing so as to be struck by the mail hook. The plaintiff

16

presented evidence that, when the mail car swayed or moved around a curve, the mail hook might pivot and the curled end could swing out more than three feet from the rail. The record also indicated that there were mounds of dirt and cinders of varying heights, with conflicting evidence regarding their proximity to the rails. *Id*.

In short, there was conflicting *evidence* from which the jury could draw inferences either in favor of the plaintiff's theory or the railroad's theory. As the Court stated:

> Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion.

*Id.* at 653. This passage does not embrace speculation in any case, FELA or otherwise. Rather, this statement stands as a frank admission that, as Apostle Paul wrote, we see through a glass darkly, and so judges and juries are constrained to draw reasonable inferences as best they can from experience and logic. Indeed, the Court in *Lavender* expressly reiterated the need for "an evidentiary basis for the jury's verdict." *Id. Lavender* does not stand for the proposition that speculative evidence of causation is sufficient to submit a case to a jury. Instead, it stands for the unremarkable proposition that conflicting evidence from which a jury could draw opposite conclusions requires the trial court to submit the case to a jury.

In *Gallick v. Baltimore & Ohio Railroad Company*, 372 U.S. 108, 109 (1963), a railroad employee was bitten by an insect while he was working near a pool that contained dead and decayed rats and pigeons. The railroad was aware of the existence of this stagnant pool. The employee grasped the spot on his leg where he was bitten and crushed a large insect. The bite

17

became infected. The infection worsened and ultimately necessitated the amputation of his legs. *Id.* Some of the doctors diagnosed or characterized the wound as "pyodermagangrenosa, secondary to insect bite." *Id.* at 110. The jury returned a verdict in favor of the employee. *Id.* at 109. In reversing, the state court found the evidence of a causal link impermissibly speculative to justify a plaintiff's verdict, reasoning that the insect could have come from a nearby polluted river, or from "unsanitary places situated on property not owned or controlled by the railroad." *Id.* at 112. The Supreme Court reversed, citing the following:

(1) insects were seen on, over and about this stagnant pool;

(2) the employee stood near the pool for about a half a minute; then he started to walk away and was bitten on the leg after he took a few steps, perhaps one or two seconds later;

(3) the employee had at times seen insects of about the same size as that which bit him crawling over the dead rats and pigeons in the stagnant pool;

(4) two medical witnesses testified that stagnant, rat-infested pools breed and attract insects; and

(5) the jury specifically found that the pool accumulated and attracted bugs and vermin.

*Id.* at 113. These facts permitted the jury to draw a logical inference that the bug that bit the employee came from the stagnant pool owned by the railroad rather than from elsewhere and, therefore, the case was properly submitted to the jury. *Id.* at 114-15.

Finally, in *Bly v. Southern Railway Co.*, 183 Va. 162 (1944), this Court reviewed the sufficiency of the evidence for a railroad employee who fell to his death. His body was recovered at the base of one of the steel piers of a bridge, "approximately under the point on the bridge where the caboose rested." *Id.* at 170. As a flagman, the employee was required to "leave the caboose and go back a sufficient distance to flag other trains that may be approaching from

18

the rear." *Id.* at 165. There was no walkway on the bridge, and the deck of the bridge was uncovered. *Id*. at 165-66. To get onto the bridge, the flagman was required to back down the steps of the caboose and "swing around to the back of the cab and step on the deck of ties." *Id.* at 166. The caboose was wider than the bridge, forcing the employee to swing around to gain a footing on the bridge. The accident occurred at night and there were no lights on the bridge. *Id.* at 170.

The railroad argued that the employee could have fallen in any number of ways that did not implicate the absence of a walkway on the bridge. *Id.* at 175. For example, the employee might have attempted to light a cigarette and lost his balance, or may have been looking at his watch while walking. *Id.* Therefore, the railroad argued, the evidence did not prove a causal connection between the alleged negligence - the absence of a walkway on the bridge - and the employee's death. *Id.* at 174-75. Although the jury found in favor of the plaintiff, the trial court set aside the verdict. *Id.* at 164.

We reversed the judgment of the trial court. We observed that "[t]he focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury." *Id.* at 175. We also noted that a "reasonable inference *does not include speculative assumption*." *Id*. at 176 (emphasis added). Given the facts before the Court, "[t]he jury could have found from the testimony and the photographs that were introduced that the bridge here, without a walkway, was obviously a dangerous place for a flagman to attempt to alight upon from a caboose." *Id.* at 169-70. In addition, the jury "could also have found that the manner of alighting from the caboose which was described by the defendant's expert witness, and not contradicted, was obviously dangerous." *Id.* at 170. The jury could draw a "legitimate inference of want of due care on the part of the defendant." *Id.* at 176.

19

There are some superficial similarities between the instant case and *Bly*: the plaintiff fell and no one witnessed the accident. The similarities end there. The facts presented in *Bly* permitted the jury to link the negligence of the defendant to the plaintiff's death. The railroad required the plaintiff to perform a dangerous, gymnastic-style maneuver, in the dark, to alight upon a bridge – and plunge to his death if he got it wrong. The plaintiff's body was found approximately under the point on the bridge where the caboose rested. *Id.* at 170. The jury could deduce that the dangerous conditions were the cause in fact of the plaintiff's death. In this case, no evidence permits an inference that extra width on the level portion of the path would have prevented the plaintiff's fall.

When a plaintiff presents sufficient circumstantial evidence that permits a factfinder to draw inferences from that evidence, as in the cases above, it is the reviewing Court's duty to see to it that the jury has the opportunity to weigh the evidence. Conversely, when evidence of causation is absent, a court has a duty to grant a motion to strike. *See Garza v. Norfolk S. Ry. Co.*, 536 Fed. Appx. 517, 521 (6th Cir. 2013) (dismissing FELA claim because no evidence established that a different locomotive design would have prevented a collision and, consequently, the plaintiff's case was deficient for failing to establish "but for" causation); *Omega Protein, Inc. v. Forrest*, 284 Va. 432, 440-42 (2012) (reversing judgment in a Jones Act case for failure to prove that the allegedly negligent act, the failure to obtain an MRI, bore any causal connection to the plaintiff's injury); *Newton v. Norfolk S. Corp.*, Civil Action No. 05-01465, 2008 WL 55997, at *8 (W.D. Pa. Jan. 3, 2008) (unpublished) (finding the plaintiff failed to establish "but for" causation under FELA because "there is no evidence . . . that at the time of the fall [the plaintiff] was on the [allegedly defective] bath mat" and further noting that

20

"[t]he FELA's relaxed causation standard is not so relaxed as to allow the jury to speculate or guess when no evidence of cause in fact has been presented.").

This case bears a striking resemblance to *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69 (3rd Cir. 1996). Although *Fedorczyk* is not a FELA case, the "but for" causation principles at issue are the same. In *Fedorczyk*, the plaintiff fell in the bathtub while she showered and claimed the cruise line was negligent for failing to place adequate abrasive strips in the tub. *Id.* at 72. The plaintiff did not know "whether her feet were on or off the abrasive strips at the time of her fall." *Id.* Fedorczyk introduced expert testimony that the defendant "deviated from an acceptable standard of care in failing adequately to treat or texturize the tub, and that the spacing between the nonslip strips was the direct cause of Fedorczyk's injuries." *Id.* at 72.

The trial court granted summary judgment in favor of the defendant, and the Third Circuit affirmed. *Id.* The Court recognized "that the more stripping there is in the tub, the less likely it is a person would fall because of inadequate stripping." *Id.* at 75. However, the argument "that inadequate stripping caused Fedorczyk's injuries [was] not based on any direct or circumstantial evidence of where she was standing when she fell." *Id.* at 75. "No evidence presented tends to prove Fedorczyk was standing either on or off the stripping at the time she fell. Without such evidence, the jury is left to speculate whether Royal Cruise's negligence was the cause in fact of her injury." *Id.* at 75.

Here, like in *Fedorczyk*, the record is devoid of any evidence tending to show what caused the plaintiff to fall. It is possible in this case that Sumner fell because the walkway was too narrow, just like it is possible that Fedorczyk fell because of inadequate stripping in the bathtub. But the law requires more. "A mere possibility of causation is not enough; and when

21

the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Id.* (quoting Restatement (Second) of Torts §433B (1965)).

IV.      SUMMARY AND CONCLUSION.

The FELA holds railroads liable for employees' injuries "*resulting* in whole or in part from [carrier] negligence." 45 U.S.C. § 51 (emphasis added). "Resulting" is a term of causation. "The [FELA] does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur. And that negligence must be 'in whole or in part' *the cause* of the injury." *Ellis v. Union Pac. R.R. Co.*, 329 U.S. 649, 653 (1947) (emphasis added). Sumner's fall, alone, is not evidence that connects the railroad's alleged negligence to his injury and it is not a justification, by itself, for liability under the FELA. "If a defendant's conduct is not a necessary condition for the plaintiff's harm, it quite simply lacks the essential connection that is the glue for all tort claims." Michael D. Green, *The Federal Employers' Liability Act: Sense and Nonsense about Causation*, 61 DePaul L. Rev. 503, 511 (2012).

As one appellate court observed, some FELA cases have been submitted to juries based upon evidence "scarcely more substantial than pigeon bone broth." *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1061 (7th Cir. 1998) (quoting *Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 132 (7th Cir. 1990)). Here, the watery broth does not contain even pigeon bones. I would reverse the judgment of the trial court based on the failure to establish cause in fact.